## DUANE BANKS *v.* JAMES E. THOMAS, STATE'S ATTORNEY
### (SC 15353)

Borden, Berdon, Palmer, McDonald and Dupont, Js.

Argued January 15—officially released July 15, 1997

*Suzanne Zitser*, assistant public defender, for the plaintiff in error.

*Harry Weller*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Edward Narus*, assistant state's attorney, for the defendant in error.

*Opinion*

PALMER, J. This case is before us on a writ of error brought by the plaintiff in error, Duane Banks (plaintiff), who seeks reversal of the judgment of the trial court summarily finding him in criminal contempt of court on three separate occasions during a hearing on his

application for a bail reduction.[1] The trial court sentenced the plaintiff to consecutive prison terms of three

---

[1] General Statutes §§ 51-33 and 51-33a and Practice Book §§ 985, 986 and 988 set forth the procedures applicable to criminal contempt proceedings.

General Statutes § 51-33 provides: "Punishment for contempt of court. Any court, including a family support magistrate, may punish by fine and imprisonment any person who in its presence behaves contemptuously or in a disorderly manner; but no court or family support magistrate may impose a greater fine than one hundred dollars or a longer term of imprisonment than six months or both."

General Statutes § 51-33a provides: "Criminal contempt. (a) Any person who violates the dignity and authority of any court, in its presence or so near thereto as to obstruct the administration of justice, or any officer of any court who misbehaves in the conduct of his official duties shall be guilty of contempt and shall be fined not more than five hundred dollars or imprisoned not more than six months or both.

"(b) No person charged with violating this section may be tried for the violation before the same judge against whom the alleged contempt was perpetrated."

Practice Book § 985 provides: "[Criminal Contempt]—In General

"A criminal contempt is conduct that is directed against the dignity and authority of the court. The sanction for a criminal contempt is punitive in order to vindicate the authority of the court."

Practice Book § 986 provides: "[Criminal Contempt]—Who May Be Punished

"The judicial authority may punish by fine or imprisonment or both:

"(1) Any person who in the court's presence behaves in a contemptuous or disorderly manner;

"(2) Any person who violates the dignity and authority of any court, or any judicial authority, in its presence or so near thereto as to obstruct the administration of justice;

"(3) Any officer of the court who misbehaves in the conduct of his official court duties; or

"(4) Any person disobeying in the course of a civil or criminal proceeding any order of a judicial authority."

Practice Book § 988 provides: "[Criminal Contempt—Summary Contempt]— — Nature of Proceedings

"A criminal contempt may be punished summarily if the conduct constituting the contempt was committed in the actual presence of the court or of the judicial authority and such punishment is necessary to maintain order in the courtroom. A judgment of guilty of contempt shall include a recital of those facts on which the adjudication of guilty is based. Prior to the adjudication of guilt the judicial authority shall inform the defendant of the accusation against him or her and inquire as to whether the defendant has any cause to show why he or she should not be adjudged guilty of contempt by presenting evidence of excusing or mitigating circumstances."

months on each contempt finding. The plaintiff claims that the court improperly: (1) determined that his conduct was contemptuous; (2) failed to disqualify itself and refer the charges to another judge for adjudication; and (3) proceeded against him in a summary, rather than a nonsummary, manner. The defendant in error, James E. Thomas,[2] contends that the writ must be dismissed for lack of subject matter jurisdiction because it was not filed within the time period specified by General Statutes § 52-273 and Practice Book § 4144.[3] We reject the state's contention that the writ must be dismissed and, upon review of the merits of the plaintiff's claims, we affirm the judgment of the trial court with respect to the first contempt finding and reverse the judgment as to the second and third findings.

The relevant facts are not in dispute. On May 2, 1995, the plaintiff was charged with robbery in the first degree, conspiracy to commit robbery in the first degree, assault in the first degree, and conspiracy to commit assault in the first degree.[4] Bail was set initially

[2] Thomas is the state's attorney for the judicial district of Hartford-New Britain at Hartford. The defendant in error is hereinafter referred to as the state.

[3] General Statutes § 52-273 provides: "Writ of error; limitations. No writ of error may be brought in any civil or criminal proceeding, unless allowed and signed within two weeks after the rendition of the judgment or decree complained of. No writ of error may be brought in any civil or criminal proceeding for the correction of any error which might have been reviewed by process of appeal."

At all times relevant to this appeal, Practice Book § 4144 provided in pertinent part: "The procedure for filing, prosecuting and defending a writ of error shall be in accordance with the rules for appeals except that:

"(a) Upon payment in the trial court of the necessary fees and filing of the necessary security for costs, the writ, if in proper form, must be allowed and signed by a judge or clerk of the court in which the judgment or decree was rendered, within two weeks after the rendition of the judgment or decree . . . ." Section 4144 was amended effective September 3, 1996, which was subsequent to the trial court's signing of the writ of error in this case.

[4] *State* v. *Banks*, Superior Court, judicial district of Hartford-New Britain at Hartford, geographical area number fourteen, Docket No. CR95-0471451S (November 15, 1996). At oral argument, we were informed by the plaintiff's

at $500,000, and the plaintiff, who was unable to post bail, was incarcerated pending trial. On June 7, 1995, the trial court, *Espinosa, J.*, reduced the plaintiff's bail to $300,000. Due to his inability to satisfy the reduced bail, however, the plaintiff remained incarcerated.

On November 17, 1995, the plaintiff filed a motion for a further bail reduction, which was heard by Judge Espinosa on November 29, 1995.[5] At the hearing, the plaintiff's attorney, Margaret Levy, sought to have the plaintiff's bail reduced to $35,000.[6] Levy argued in support of the proposed reduction that: (1) the plaintiff had been incarcerated in lieu of bond since his arrest on the robbery and assault charges more than seven months earlier; (2) the plaintiff's family, which resided in Hartford, would be able to post a $35,000 full surety bond; (3) if released, the plaintiff was welcome to return to the home of his girlfriend, with whom he had been living at the time of his arrest; (4) the plaintiff was willing to wear an electronic monitoring device that would alert the authorities in the event that he attempted to leave the area; (5) the plaintiff planned to seek employment through an employment agency that previously had placed him in various temporary jobs; and (6) contrary to information that might have been provided to the court in connection with a previous bail hearing, there were no outstanding parole violation charges pending against him.

counsel that, during the pendency of this appeal, the plaintiff was convicted of the crimes of robbery in the first degree, conspiracy to commit robbery in the first degree and robbery in the third degree, and that on November 15, 1996, he was sentenced to a total effective term of imprisonment of twenty-five years for those offenses.

[5] Previously, on July 26, 1995, the trial court, *Miano, J.*, had denied a second bail reduction application by the plaintiff.

[6] The bail hearing was audiotaped by an official court monitor, who thereafter prepared a transcript of the proceeding from that audiotape. On October 9, 1996, the plaintiff filed a motion requesting permission to supplement the record on appeal with a verified copy of the actual audiotape of the proceedings. We granted the plaintiff's motion on October 29, 1996.

The state opposed the proposed reduction, asserting that the plaintiff had a prior conviction for escape and two prior convictions for failure to appear and, in addition, that he had been adjudicated in violation of probation twice. The state further argued that: the plaintiff had given a written confession regarding his involvement in the robbery; he had implicated two accomplices in the offense; and one of the robbery victims had been shot and seriously wounded by an accomplice. The state maintained that a further reduction of the plaintiff's bail would be inappropriate in light of the strength of the case against the plaintiff, the seriousness of the charges, the plaintiff's prior record, and the likelihood that the plaintiff would receive a substantial prison term if convicted. The plaintiff's attorney responded that: the plaintiff planned to contest the validity of the alleged confessions at a later date; although the state's documents indicated that the plaintiff had two failure to appear convictions, in fact he had only one such conviction; and the proposed $35,000 full surety bond, coupled with the condition that he wear an electronic monitoring device, was sufficient to ensure the plaintiff's presence in court. The trial court denied the plaintiff's motion without elaboration.

Immediately after the court had ruled on the plaintiff's motion, the plaintiff requested the opportunity to address the court personally. During the course of the colloquy following the plaintiff's request, the court summarily adjudicated the plaintiff in criminal contempt on three separate occasions and sentenced him to consecutive prison terms of three months on each of the three contempts. Because what occurred during the colloquy between the court and the plaintiff is critical to our resolution of the plaintiff's claims, that colloquy is set forth in this opinion in its entirety.[7]

---

[7] We have carefully reviewed the audiotape of the proceedings; see footnote 6 of this opinion; as well as the transcript of those proceedings prepared

"The [Plaintiff]: I don't get a chance to speak?

"The Court: I would recommend that you talk to your lawyer because anything you say can and will be used against you.

"The [Plaintiff]: I'm well aware of that, Your Honor.

"The Court: All right, what would you like to say?

"The [Plaintiff]: I would like to say first of all that the last failure to appear conviction from 1989, I was incarcerated and that had been—

"The Court: But you pled guilty to it anyway?

"The [Plaintiff]: No, that had been clarified so that shouldn't even be on the record for one. And the last valid failure to appear that I had is over ten years old in which case also I know that's not an issue here, it's just that it does exist. However, I am a different person from then, because everybody does change. And as far as a flight risk, that's nonsense because like my counselor's already asked and before the court I would be willing to post a bond, I would be on a monitor, there would be a sufficient amount of real estate put up, so—

"The Court: Mr. Banks, if you're just going to repeat what your lawyer said I heard her—

"The [Plaintiff]: Yeah.

"The Court: I considered her arguments and I denied it.

"The [Plaintiff]: All right, well—

"The Court: So if you have anything new to say I'll listen but I don't want—

"The [Plaintiff]: All right.

by the official court monitor. On the basis of our review of the audiotape, we have made several minor corrections to that transcript.

"The Court:—to hear her arguments rehashed.

"The [Plaintiff]: Well let me just go here then, isn't the purpose of bond only to ensure the—that I show up for court?

"The Court: That's correct.

"The [Plaintiff]: But I'm just a regular individual from the north end, I'm not a professional athlete or anything. Three hundred thousand dollars is ridiculous, you might as well say that don't give me a bond at all because you know, he knows and everybody else knows that I can't make a bond like that, therefore—

"The Court: Well, the court—

"The [Plaintiff]: You're not even giving me the opportunity to post a bond—

"The Court: I've heard enough. Do not say one more word. The court has considered all of the circumstances and has ruled.

"The [Plaintiff]: All right and I just would like—

"The Court: That's all.

"The [Plaintiff]:—it to be on the record that I never—

"The Court: I don't want to hear anything else.

"The [Plaintiff]:—did confess to any crime.

"The Court: I don't want to hear anything else.

"The [Plaintiff]: I never confessed to any crime—

"The Court: Be quiet—

"The [Plaintiff]: And I'm not making no changes—

"The Court:—or I'm going to hold you in contempt.

"The [Plaintiff]:—in my statement, either.

"The Court: Come back here.

"The [Plaintiff]: What?

"The Court: I want you to show cause why you should not be held in contempt for speaking after I told you not to. What's your explanation?

"The [Plaintiff]: Because I've been incarcerated for eight months listening to him—

"The Court: I don't care.

"The [Plaintiff]:—and other people—

"The Court: I don't care. That doesn't give you the right to come in here and—

"The [Plaintiff]:—making—

"The Court:—think that you're going to take over this courtroom.

"The [Plaintiff]: I'm not trying to take over, but I been quiet so long, I feel like I need to be heard.

"The Court: I want you to be quiet.

"The [Plaintiff]: I need to be heard.

"The Court: I want you to be quiet.

"The [Plaintiff]: I need to be heard. I'm tired of—

"The Court: The court finds that you have violated the court's order to stop talking when you were ordered to. That you have demonstrated a flagrant disrespect for this court and the court is going to hold you in contempt. You are hereby sentenced to three months. That's all.

"The [Plaintiff]: The court's disrespecting me.

"The Court: All right, come back here again. What was that?

"The [Plaintiff]: I said I feel like I been disrespected.

"The Court: Now you have disrespected the court again. Now I want you to show cause why you should not be held in contempt for more time.

"The [Plaintiff]: Because don't I have the right to speak?

"The Court: No, not when I tell you not to.

"The [Plaintiff]: I would—

"The Court: Do you want to apologize?

"The [Plaintiff]: Yeah, I'll apologize.

"The Court: All right—

"The [Plaintiff]: But after that can I still speak?

"The Court: No. I've heard enough—

"Defense Counsel [Margaret Levy]: Let's go—

"The Court: That's it.

"Defense Counsel: (inaudible) okay?

"The [Plaintiff]: Yeah, okay.

"The Court: No, come back here. You're a wise guy—

"The [Plaintiff]: I was talking to her.

"The Court: You're disrespectful. Three more months. That's it.

"The [Plaintiff]: Uh hum, yup.

"The Court: You want more?

"The [Plaintiff]: Do whatever you like.

"The Court: Come back. The court finds that you have been disrespectful again, repeatedly. Three more months. That's all.

"The [Plaintiff]: This—this ain't no courtroom.

"The Court: Come back. You want to keep doing this until you add up the time?

"The [Plaintiff]: This will be the only conviction you get of me.

"The Court: Do you want to add more time? We can do this all day and you'll be in jail longer than you will on the other charge. Shall we do it again?

"The [Plaintiff]: Are you comfortable now? You've given me about three (inaudible)—

"The Court: How much are we up to now, [Edward Narus, Assistant State's Attorney]?

"Mr. Narus: Nine months, Your Honor.

"The Court: Nine months? That's right, because this court will not tolerate disrespect. When I say do not talk you do not talk. Now I gave you the courtesy of talking which I don't to all defendants and you were disrespectful. You continue to be disrespectful because you do not stop talking as you walk out of the courtroom. You continue to make disrespectful comments to the court. And as long as you continue to do that the court will find you in contempt, do you understand that, sir? Do you understand that? I guess you don't understand that. So by your silence you're indicating that you are still being disrespectful because you will not answer the court's questions. Is that correct?

"The [Plaintiff]: Do you want me to talk or not?

"The Court: I want you to answer my question.

"The [Plaintiff]: Yeah, I understand that.

"The Court: All right. That's it." The court then called the next case.

On December 18, 1995, nineteen days after the rendition of the contempt judgment, the plaintiff submitted

an application pursuant to Practice Book § 4018[8] for a waiver of the fees, costs and expenses of an appeal. The application was granted on January 3, 1996. On January 16, 1996, this writ of error was filed, allowed and signed pursuant to Practice Book § 4144.[9] See foot-

[8] At all times relevant to this appeal, Practice Book § 4018 provided: "[Waiver of Fees, Costs and Security]—Criminal Cases

"Any defendant in a criminal case who is indigent and desires to appeal, and has not previously been determined to be indigent, may, within the time provided by the rules for taking an appeal, make written application to the court to which the fees required by statute or rule are to be paid, for relief from payment of fees, costs and expenses. The application must be under oath and recite, or it must be accompanied by an affidavit reciting, the grounds upon which the applicant proposes to appeal and the facts concerning the applicant's financial status.

"The application must be sent to the public defender's office for investigation. The judicial authority shall assign the request for waiver of fees, costs and expenses for hearing within twenty days after filing, and the trial counsel, the trial public defender's office to which the application had been sent for investigation and the chief of legal services of the public defender's office shall be notified in writing by the clerk's office of the date of such hearing.

"The judicial authority shall act promptly on the application following the hearing. Upon determination by the judicial authority that a defendant in a criminal case is indigent, the court to which the fees required by statute or rule are to be paid may (1) waive payment by the defendant of fees specified by statute and of taxable costs, and waive the requirement of Sec. 4015 concerning the furnishing of security for costs upon appeal, (2) order that the necessary expenses of prosecuting the appeal be paid by the state, and (3) appoint appellate counsel and permit the withdrawal of the trial attorney's appearance provided the judicial authority is satisfied that that attorney has cooperated fully with appellate counsel in the preparation of defendant's appeal.

"When the judicial authority has appointed an attorney in private practice to represent the defendant upon appeal, the attorney shall obtain the approval of the judicial authority who presided at the trial before incurring any expense in excess of $100, including the expense of obtaining a transcript of the necessary proceedings or testimony. The judicial authority shall authorize a transcript at state expense only of the portions of proceedings or testimony which may be pertinent to the issues on appeal." On September 3, 1996, after the plaintiff had applied for a waiver of fees, costs and expenses, certain minor technical changes to this Practice Book provision became effective. See also footnote 3 of this opinion.

[9] On January 17, 1996, the trial court, *Schimelman, J.*, granted the plaintiff's motion for a stay of execution of the nine month sentence imposed on him by Judge Espinosa pending resolution of the plaintiff's appeal.

note 3 of this opinion. The plaintiff claims that: (1) as a matter of law, his conduct was not contemptuous; (2) the trial court improperly failed to disqualify itself from adjudicating the charges; and (3) he was entitled to a nonsummary disposition of the contempt charges.[10] Although we reject the plaintiff's claim regarding the first contempt finding, we conclude that the record does not support the second and third findings.[11]

I

Before turning to the plaintiff's claims, we first address the state's contention that the two week limitation period set forth in § 52-273 is mandatory and, consequently, that we lack subject matter jurisdiction to entertain the plaintiff's writ of error because it was not filed within that time period.[12] We conclude that the

[10] The plaintiff also claims that the trial court improperly failed: (1) to provide him with notice and an opportunity to be heard with respect to the second and third contempt findings as guaranteed under the due process clause of the federal constitution and as required by Practice Book § 988; see footnote 1 of this opinion; and (2) to afford him a jury trial in light of the fact that his total sentence exceeded six months in prison. We do not consider the plaintiff's due process claim because we conclude that the trial court's judgment as to the second and third contempt findings must be reversed on other grounds. We also do not reach the plaintiff's jury trial claim because, due to our reversal of the second and third contempt findings, the plaintiff will be required to serve a sentence of less than six months imprisonment. In addition, we note that although the plaintiff challenges the validity of the contempt finding, he does not otherwise contest the length of the three month prison term imposed by the court.

[11] Although the trial court did not specify the statutory or Practice Book provisions upon which it had based its contempt findings, the judgment file, signed by an assistant clerk of the court, indicates a violation of General Statutes § 51-33. It is apparent, however, that the trial court also relied upon Practice Book § 986 (4); see footnote 1 of this opinion; which provides an independent basis for a contempt finding that is predicated upon conduct constituting disobedience to an order of the court rendered in the course of a civil or criminal proceeding. See *State* v. *Murray*, 225 Conn. 355, 623 A.2d 60, cert. denied, 510 U.S. 821, 114 S. Ct. 78, 126 L. Ed. 2d 46 (1993).

[12] On February 5, 1996, the state filed a motion to dismiss the writ of error, claiming that the plaintiff's failure to file the writ within two weeks of the summary contempt judgment deprived this court of subject matter

plaintiff's failure to file the writ of error within the prescribed time period does not require dismissal of the writ.[13]

"It is axiomatic that, except insofar as the constitution bestows upon this court jurisdiction to hear certain cases . . . the subject matter jurisdiction of the Appellate Court and of this court is governed by statute." (Citation omitted.) *Waterbury Teachers Assn.* v. *Freedom of Information Commission,* 230 Conn. 441, 447, 645 A.2d 978 (1994). "The question of whether a statutory time limitation is subject matter jurisdictional is a question of statutory interpretation. *Ambroise* v. *William Raveis Real Estate, Inc.,* 226 Conn. 757, 764, 628 A.2d 1303 (1993). Thus, we look to whether the legislature intended the time limitation to be jurisdictional.

jurisdiction under § 52-273 and § 4144. We denied the state's motion to dismiss without prejudice to renewal of this claim on appeal.

[13] At the time the plaintiff filed his writ of error, § 4144 provided that "[t]he procedure for filing, prosecuting and defending a writ of error shall be in accordance with the rules for appeals except" as otherwise mandated. Because § 4144 contained no provision regarding applications for the waiver of fees, costs and expenses, such applications were governed by § 4018, which stated at all times relevant to this appeal that "[a]ny defendant in a criminal case who is indigent and desires to appeal, and [who] has not previously been determined to be indigent, may, within the time provided by the rules for taking an appeal, make written application to the court to which the fees required by statute or rule are to be paid, for relief from payment of fees, costs and expenses. . . ." See footnote 8 of this opinion. Thus, the plaintiff was responsible for filing his application for waiver of fees, costs and expenses within the two week limitation period of § 4144 in order to toll the running of that time period. In this case, the plaintiff's § 4018 application, filed nineteen days after the rendition of the judgment, failed to satisfy the provisions of § 52-273 and § 4144.

The plaintiff asserts that his failure to file the application for waiver of costs, fees and expenses in a timely manner was due to his counsel's good faith, but mistaken, belief that the limitation period applicable to a criminal appeal, namely, twenty days, is also applicable to a writ of error. The state does not dispute this claim. Furthermore, the state, at oral argument, indicated that it had no objection to our consideration of the merits of the plaintiff's claims in the event that we conclude that failure to comply with the limitation period set forth in § 52-273 does not implicate the court's subject matter jurisdiction.

The legislative intent is to be discerned by reference
to the language of the statute, its legislative history and
surrounding circumstances, the policy the limitation
was designed to implement, and the statute's relation-
ship to the existing legislation and common law princi-
ples governing the same subject matter. [Id.] In light
of the strong presumption in favor of jurisdiction, we
require a strong showing of a legislative intent to create
a time limitation that, in the event of noncompliance,
acts as a subject matter jurisdictional bar. Id., 765."
(Internal quotation marks omitted.) *Federal Deposit
Ins. Corp.* v. *Hillcrest Associates,* 233 Conn. 153, 163,
659 A.2d 138 (1995); see also *Simms* v. *Warden,* 230
Conn. 608, 614–15, 646 A.2d 126 (1994). Applying these
rules to the present circumstances, we conclude that
the state has not satisfied its substantial burden of
establishing that the two week period prescribed by
§ 52-273 is subject matter jurisdictional.

Although the statutory phraseology is cast in terms
generally suggestive of a mandatory construction; see,
e.g., *Caron* v. *Inland Wetlands & Watercourses Com-
mission,* 222 Conn. 269, 279–80, 610 A.2d 584 (1992)
(use of negative or prohibitory language supports infer-
ence that statutory time period is mandatory); § 52-273
contains no language expressly invalidating a writ of
error not filed within two weeks from the rendition of
the judgment or decree. See *Katz* v. *Commissioner of
Revenue Services,* 234 Conn. 614, 617, 662 A.2d 762
(1995) ("[a] reliable guide in determining whether a
statutory provision is directory or mandatory is whether
the provision is accompanied by language that
expressly invalidates any action taken after noncompli-
ance with the provision"). Moreover, the legislative his-
tory of § 52-273 contains no indication that the
legislature intended to deprive this court of the author-
ity to entertain an untimely writ of error. Prior to 1935,
a writ of error was to be filed within three years from

the rendition of the judgment. General Statutes (1838 Rev.) tit. LX, § 9; see also *Cutting* v. *Yudkin*, 137 Conn. 635, 638, 79 A.2d 823 (1951). In 1935, the legislature reduced the time period that applied to the filing of such writs to two weeks. General Statutes (Cum. Sup. 1935) § 1664c. Although there is no recorded legislative history regarding that statutory amendment,[14] it is apparent that the legislature sought to expedite the filing of writs of error by establishing a limitation period similar to that for appeals. There is no indication, however, that the legislature contemplated that noncompliance with that filing period would serve as a complete and automatic bar to appellate review of the writ.[15]

In contrast, it is clear that the writ of error, like the court's "inherent . . . power to punish all contempts committed in its presence"; *Ullmann* v. *State*, 230 Conn. 698, 705, 647 A.2d 324 (1994); is deeply rooted in our common law. *State* v. *Assuntino*, 173 Conn. 104, 109–10, 376 A.2d 1091 (1977); *State* v. *Caplan*, 85 Conn. 618, 622, 84 A. 280 (1912); see also C. Tait & E. Prescott, Connecticut Appellate Practice and Procedure (Sup. 1996) § 8.1 (b), p. 8-2 ("[t]he writ of error is both a common law writ and a creature of statute"). Thus, the

---

[14] Although the amendment, as originally proposed, was entitled "An Act concerning Restricting of the Use of the Writ of Error," the version of the amendment that was enacted was entitled "An Act Concerning the Use of the Writ of Error." Compare H.R. 812, Jan. Sess. (1935) with Public Acts 1935, c. 111, § 1, p. 265.

[15] Prior to 1982, § 52-273 provided: "No writ of error *shall* be brought in any civil or criminal proceeding, unless allowed and signed within two weeks after the rendition of the judgment or decree complained of, nor for the correction of any error which might have been reviewed by process of appeal." (Emphasis added.) In 1982, the legislature amended § 52-273; see Public Acts 1982, No. 82-160, § 143 (P.A. 82-160); by dividing it into two sentences and substituting the word "may" for the word "shall." Public Act 82-160 cannot be viewed as having made any substantive changes in § 52-273 because P.A. 82-160 was clearly technical in nature. See generally 25 S. Proc., Pt. 3, 1982 Sess., pp. 686–89; 25 H.R. Proc., Pt. 9, 1982 Sess., pp. 2752–57; 25 H.R. Proc., Pt. 10, 1982 Sess., pp. 3282–91; Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1982 Sess., pp. 347–48, remarks of David Biklen.

state's construction of § 52-273 as limiting our subject matter jurisdiction to those writs of error filed within two weeks of the rendition of the judgment would constitute a dramatic departure from the authority vested in this court under the common law.[16] "Absent clear intent to do so, a statute should not be construed as altering the common law rule . . . and should not be construed as making any innovation upon the common law which the statute does not fairly express." (Internal quotation marks omitted.) *Ullmann* v. *State*, supra, 705. Accordingly, we conclude that neither the language of § 52-273 nor its legislative history provides persuasive support for the state's contention that the two week limitation period contained in § 52-273 is subject matter jurisdictional.

The harsh result engendered by the state's approach provides additional support for our conclusion. A writ of error is the sole method of review of a summary criminal contempt proceeding. Id., 703; *In re Dodson*, 214 Conn. 344, 346, 572 A.2d 328, cert. denied, 498 U.S. 896, 111 S. Ct. 247, 112 L. Ed. 2d 205 (1990). If this court were barred from reviewing the merits of the plaintiff's claims because he had failed to comply with the statutory limitation period, the plaintiff would be left without direct appellate recourse to challenge the trial court's summary criminal contempt finding and its sentence of nine months imprisonment.[17] We will not presume

---

[16] In light of our conclusion that the two week limitation period of § 52-273 does not bar consideration of the plaintiff's claims, we need not determine whether such a bar would be a constitutionally impermissible encroachment upon this court's authority to entertain a writ of error. Cf. *State* v. *Assuntino*, supra, 173 Conn. 110; see also C. Tait & E. Prescott, supra, § 2.8 (d), pp. 2-7 through 2-9.

[17] Of course, a contemnor whose counsel negligently has failed to file a writ of error in a timely manner could seek habeas corpus relief on the ground of ineffective assistance of appellate counsel. Cf. *Evitts* v. *Lucey*, 469 U.S. 387, 105 S. Ct. 830, 83 L. Ed. 2d 821 (1985) (due process considerations prohibit state from extinguishing first criminal appeal as of right due to ineffective assistance of appellate counsel). A contemnor's ability to file a habeas petition, however, does not fully alleviate the harshness of the result that the state's suggested statutory construction would produce.

that the legislature intended such a harsh result absent convincing evidence to the contrary. Moreover, we have eschewed such a mechanistic interpretation of our appellate rules in recognition of the fact that an unyielding policy requiring strict adherence to an appellate limitation period—no matter how severe or unfair the consequences—does not serve the interests of justice.[18] See, e.g., *Teguis* v. *Reber*, 235 Conn. 471, 472–73, 667 A.2d 551 (1995) ("[u]nder our case law the Appellate Court, in response to the defendant's timely motion to dismiss . . . was vested with discretion to determine whether to grant the motion or to permit the plaintiff to pursue a late appeal"); *Kelley* v. *Bonney*, 221 Conn. 549, 559, 606 A.2d 693 (1992) ("[e]ven if a party to an appeal timely moves to dismiss an untimely appeal, the Appellate Court, and this court, continue to have discretion to hear the appeal").

In light of these considerations, and "taking into account the established principle that every presumption is to be indulged in favor of jurisdiction"; (internal quotation marks omitted) *Ambroise* v. *William Raveis Real Estate, Inc.*, supra, 226 Conn. 765; we conclude that noncompliance with the two week limitation period of § 52-273 does not deprive this court of subject matter jurisdiction over a writ of error. Moreover, in this case, the state, which has suffered no prejudice from the short filing delay, does not object to our review of the

---

[18] Consequently, we have recognized that " '[w]here an appeal properly lies, but there has been a failure to follow the requirements of the statutes or rules, the appeal is ordinarily not void, but voidable; the defect may be waived by a failure to take advantage of it; and unless attacked by motion the court will proceed to determine the appeal. The [Connecticut] [S]upreme [C]ourt has said broadly that defects in the method of taking an appeal do not go to the jurisdiction of the court, and has added [that to] "hold otherwise would be to exalt technicalities above substance." Examples of defects of this kind are . . . [t]he failure to take an appeal or *file a writ of error* within the proper time . . . .' " (Emphasis added.) *LaReau* v. *Reincke*, 158 Conn. 486, 493–94, 264 A.2d 576 (1969), quoting W. Maltbie, Connecticut Appellate Procedure (2d Ed. 1957) § 275, p. 352.

merits of the plaintiff's claims. Accordingly, we deem it appropriate to consider those claims, to which we now turn.[19]

## II

The plaintiff first claims that his conduct was not contemptuous as a matter of law. He maintains that in taking the opportunity granted to him by the trial court to address the court personally, his choice of words was neither profane nor provocative, and his conduct was not otherwise intentionally disrespectful or disruptive. We conclude that the record supports the first contempt finding, but not the second and third.

"Since we speak of criminal contempt as conduct against the dignity and authority of the court, it is useful briefly to articulate the concepts of dignity and authority encompassed in this context. The expression 'dignity of the court' proclaims a demand, to all dealing with the court, for proper respect and obedience in its function of interpreting, administering and enforcing the law within its authority to do so. See generally *Brannon* v. *State*, 202 Miss. 571, 582, 29 So. 2d 916 (1947). 'Authority' can be and has been said to mean the '[r]ight to exercise powers; to implement and enforce laws; to exact obedience; to command; to judge. . . . [It is] [o]ften synonymous with power.' Black's Law Dictionary (5th Ed. [1979]). In a free society, the courtroom 'is a forum for the courteous and reasoned pursuit of truth and justice.' *Taylor* v. *Hayes*, 418 U.S. 488, 503, 94 S. Ct. 2697, 41 L. Ed. 2d 897 (1974). These concepts meaningfully embody that view of dignity and authority that should attend the proper, independent and fair

---

[19] As previously indicated, we possess the authority to determine whether the provisions of our Practice Book are directory or mandatory. See *Teguis* v. *Reber*, supra, 235 Conn. 472–73; *Kelley* v. *Bonney*, supra, 221 Conn. 558–59 and n.4. For the policy reasons discussed previously, we conclude that the two week limitation period set forth in § 4144, like that contained in § 52-273, is directory.

discharge by the court of its duties under the rule of law. . . .

"It is also useful to note at this point that where summary contempt is involved, the United States Supreme Court has indicated that it is wary of the power and cognizant of its potential for abuse. It, therefore, became established early in American jurisprudence that contempt limits a court in such cases to 'the least possible power adequate to the end proposed.' *Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204, 231, 5 L. Ed. 242 (1821), quoted, inter alia, in *In re Michael*, 326 U.S. 224, 227, 66 S. Ct. 78, 90 L. Ed. 30 (1945); *In re Oliver*, 333 U.S. 257, 274, 68 S. Ct. 499, 92 L. Ed. 682 (1948); *Harris* v. *United States*, 382 U.S. 162, 165, 86 S. Ct. 352, 15 L. Ed. 2d 240 (1965); *Shillitani* v. *United States*, 384 U.S. 364, 371, 86 S. Ct. 1531, 16 L. Ed. 2d 622 (1966). The purposes, nevertheless, of a criminal contempt order are to punish willful disregard of the authority of the court and to deter the occurrence of similar derelictions. *United States* v. *United Mine Workers*, 330 U.S. 258, 302–303, 67 S. Ct. 677, 91 L. Ed. 884 (1947); *In re Irving*, 600 F.2d 1027, 1037 (2d Cir. 1979), cert. denied, 444 U.S. 866, 100 S. Ct. 137, 62 L. Ed. 2d 89 (1979). Only recently, the United States Supreme Court has observed that '[t]he underlying concern that gave rise to the contempt power was not, however, merely the disruption of court proceedings. Rather, it was disobedience to the orders of the judiciary, regardless of whether such disobedience interfered with the conduct of trial.' *Young* v. *United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987)." *In re Dodson*, supra, 214 Conn. 349–51.

Furthermore, "[t]o be held in criminal contempt, a contemnor must have the requisite intent; the conduct must be willful. *Matter of Pilsbury*, [866 F.2d 22, 27 (2d Cir. 1989)]; *United States* v. *Thoreen*, 653 F.2d 1332, 1342 (9th Cir. 1981); *Sykes* v. *United States*, 444 F.2d

928, 930 (D.C. Cir. 1971); Black's Law Dictionary (5th Ed. [1979]). Intent may be inferred from facts and circumstances. *United States* v. *Thoreen*, supra [1342]. Generally, willfulness may be inferred from a reckless disregard for a court's order. *United States* v. *Delahanty*, 488 F.2d 396 (6th Cir. 1973); *Sykes* v. *United States*, supra [930]; *Murphy* v. *State*, 46 Md. App. 138, 416 A.2d 748 (1980). Stated another way, '[t]he minimum requisite intent [for criminal contempt] is better defined as a volitional act by one who knows or should reasonably be aware that his conduct is wrongful.' *United States* v. *Seale*, [461 F.2d 345, 368 (7th Cir. 1972)]." *In re Dodson*, supra, 214 Conn. 359.

Guided by these principles, we review the record to determine whether it supports the court's summary contempt findings. We do so mindful of the fact that our review is not plenary. "[A] court exercises considerable discretion in dealing with contemptuous conduct occurring in its presence, and its summary adjudication is accorded a presumption of finality. . . . From necessity the court must be its own judge of contempts committed within its presence. . . ." (Citations omitted; internal quotation marks omitted.) *Jackson* v. *Bailey*, 221 Conn. 498, 504, 605 A.2d 1350, cert. denied, 506 U.S. 875, 113 S. Ct. 216, 121 L. Ed. 2d 155 (1992); *McClain* v. *Robinson*, 189 Conn. 663, 669, 457 A.2d 1072 (1983). Thus, " '[i]n a review of summary criminal contempt, the inquiry is limited to a determination of the jurisdiction of the court below. *Tyler* v. *Hamersley*, 44 Conn. 393, 413 (1877). Subsumed in this inquiry are three questions, namely, (1) whether the designated conduct is legally susceptible of constituting a contempt; *Goodhart* v. *State*, [84 Conn. 60, 63, 78 A. 853 (1911)]; (2) whether the punishment imposed was authorized by law; *State* v. *Jackson*, 147 Conn. 167, 169, 158 A.2d 166 (1960); and (3) whether the judicial authority was qualified to conduct the hearing. *Mayberry* v. *Pennsyl-*

*vania,* 400 U.S. 455, 465–66, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971).' " *In re Dodson,* supra, 214 Conn. 346–47; *Moore* v. *State,* 186 Conn. 256, 257, 440 A.2d 969 (1982). Although appellate review of a summary contempt finding is limited, the reviewing court nevertheless must conduct a careful examination of the record to determine whether the finding of contempt can be sustained. See, e.g., *Codispoti* v. *Pennsylvania,* 418 U.S. 506, 517 and n.6, 94 S. Ct. 2687, 41 L. Ed. 2d 912 (1974). Moreover, because "[c]riminal contempt is a crime in the ordinary sense"; *Bloom* v. *Illinois,* 391 U.S. 194, 201, 88 S. Ct. 1477, 20 L. Ed. 2d 522 (1968); and "convictions for criminal contempt are indistinguishable from ordinary criminal convictions"; id.; the record, whether it be comprised of a transcript, an audiotape, or the trial court's factual findings regarding the contemnor's gestures or other body language, must support the court's determination that the contemnor's conduct was contemptuous beyond a reasonable doubt. See, e.g., *Moore* v. *State,* supra, 258–59.

Accordingly, in reviewing the plaintiff's claim that the judgment of summary contempt should be reversed on the ground that it is not supportable as a matter of law, it is not our function either to second guess the considered judgment of the trial court or to ignore the record before us. Rather, we will sustain the court's contempt finding if, upon a careful review of the record, we conclude that the trial court reasonably could have found that the plaintiff's conduct was wilfully contumacious beyond a reasonable doubt.[20]

---

[20] Contrary to Justice Berdon's assertion in his concurring and dissenting opinion, neither our previous decisions, nor any other state or federal precedent, support his conclusion that "we must determine, as a matter of law, whether we, as judges of an appellate tribunal, find the [plaintiff's] conduct to be contemptuous." Indeed, in reviewing summary contempt findings, we long have applied the far more limited standard enunciated previously; see, e.g., *Goodhart* v. *State,* supra, 84 Conn. 63–64 (summary contempt finding will be reversed only if contemnor's conduct legally could not have constituted contempt); *Welch* v. *Barber,* 52 Conn. 147, 156 (1884) (same); and we recently

A

## First Contempt Finding

We now turn to the plaintiff's claim that the record does not support the trial court's first contempt finding. Upon a close examination of the initial colloquy between the court and the plaintiff, which we summarize in the following paragraph, we reject the plaintiff's contention regarding the first contempt finding.

The trial court, after informing the plaintiff that it did not want to hear a repetition of the arguments already made by his attorney, allowed the plaintiff to continue to address the court. When the plaintiff per-

have reaffirmed the applicability of that standard. See, e.g., *Jackson* v. *Bailey*, supra, 221 Conn. 500; *McClain* v. *Robinson*, supra, 189 Conn. 669–70. As we previously have noted, "[i]n a review of summary criminal contempt, [our] inquiry is *limited* to a determination of the jurisdiction of the court below." (Emphasis added; internal quotation marks omitted.) *Jackson* v. *Bailey*, supra, 500; *In re Dodson*, supra, 214 Conn. 346. The trial court's "summary adjudication is accorded a presumption of finality . . . [because f]rom necessity the court must be *its own judge* of contempts committed within its presence." (Citation omitted; emphasis added; internal quotation marks omitted.) *Jackson* v. *Bailey*, supra, 504; *McClain* v. *Robinson*, supra, 669.

Similarly, the United States Supreme Court cases cited by Justice Berdon do not support his conclusion that that court's "decisions clearly point in the direction of de novo review . . . ." This federal precedent, like the state decisions discussed previously, instead supports the principle that a court's summary contempt finding will be sustained on appeal unless the reviewing court determines, as a matter of law, that the court imposing the contempt could not reasonably have concluded that the conduct constituted a contempt. See, e.g., *Holt* v. *Virginia*, 381 U.S. 131, 136, 85 S. Ct. 1375, 14 L. Ed. 2d 290 (1965) ("[i]t is not charged that [the contemnors] here disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties"); see also *Eaton* v. *Tulsa*, 415 U.S. 697, 698, 94 S. Ct. 1228, 39 L. Ed. 2d 693 (1974) (same); *In re Little*, 404 U.S. 553, 555, 92 S. Ct. 659, 30 L. Ed. 2d 708 (1972) (same). Consequently, Justice Berdon's assertion that our scope of review is *plenary* is simply unfounded. Accordingly, in the absence of a compelling reason to do so, we decline to deviate from our long-standing precedent regarding the scope of appellate review of summary contempt findings.

sisted in reiterating the same points that had been made by his counsel, the court attempted to speak but was interrupted by the plaintiff, who stated, "You're not even giving me the opportunity to post a bond." The court, in clear and unequivocal language, then instructed the plaintiff not to speak, stating, "I've heard enough. Do not say one more word. The court has considered all of the circumstances and has ruled." The plaintiff, in defiance of the court's unambiguous order, interrupted Judge Espinosa several times to state that he had never confessed to any crime. The court again directed the plaintiff to stop speaking, twice stating, "I don't want to hear anything else." After directly ordering the plaintiff to "[b]e quiet," the court added the warning, "or I'm going to hold you in contempt." While walking away from the bench but still within earshot of the court, the plaintiff nonetheless continued to address the court regarding his alleged confession.

The trial court ordered the plaintiff to "[c]ome back here," stating, "I want you to show cause why you should not be held in contempt for speaking after I told you not to." The plaintiff stated that he, "need[ed] to be heard" because he had been "quiet [for] so long." The court then told the plaintiff, "I want you to be quiet." The plaintiff, however, replied, "I need to be heard." After the trial court again admonished the plaintiff to "be quiet," the plaintiff, continued defying the court's admonition and repeated that he had a "need to be heard." The trial court then found the plaintiff in contempt of court, concluding that the plaintiff had "violated the court's order to stop talking when you were ordered to [do so]" and, consequently, "That you have demonstrated a flagrant disrespect for this court . . . ."

We conclude that "[t]his conduct was a criminal contempt, directed as it was against the dignity and authority of the court." *In re Dodson*, supra, 214 Conn. 357. The

plaintiff repeatedly and deliberately defied the court's explicit commands that he refrain from speaking and, as a result, the plaintiff's outbursts caused an unwarranted delay in the resolution of the bail reduction hearing, thereby obstructing the orderly administration of justice.[21] Furthermore, the record indicates that the plaintiff's case was not the last case on the court's docket.[22] Consequently, the plaintiff's failure to heed the trial court's orders to stop speaking also impeded the progress of other business on the court's calendar.[23]

Moreover, the plaintiff, when afforded the opportunity to explain his failure to obey the court's orders, did not indicate either that he had misunderstood the court's directives or that he had not intended to disobey them; rather, he repeatedly insisted that he needed to be heard. Indeed, the plaintiff, in asserting his need to be heard, was unapologetic and, in fact, continued to flout the court's express directives to stop speaking, thereby exacerbating the situation. Under the circumstances, therefore, the trial court reasonably concluded that the plaintiff's conduct constituted a wilful violation under Practice Book § 986 (4) of the prohibition against disobeying a judicial authority during a criminal pro-

[21] The plaintiff's claim to the contrary notwithstanding, a contemnor "need not be accorded one contemptuous remark before a judge may consider a summary contempt adjudication." *In re Dodson*, supra, 214 Conn. 359.

[22] The audiotape reflects the fact that the trial court called the next case immediately upon the conclusion of the hearing on the plaintiff's motion for a bail reduction.

[23] In addition, it is apparent from the audiotape of the proceeding that there were other people in the courtroom during the bail hearing. The court, however, did not indicate how many people were in the courtroom at the time and, consequently, it is not possible for us to determine the extent to which the court may have believed that prompt action was necessary to convey to others present that a similar affront to the court's authority and dignity would not be tolerated. Cf. *Jackson* v. *Bailey*, supra, 221 Conn. 502 n.3 (trial court's articulation of reasons for summarily holding contemnor in contempt included finding that forty to fifty spectators were present in courtroom at time of contemptuous conduct).

ceeding; see footnote 1 of this opinion; as well as an affront to the court's dignity and its authority to control its proceedings.[24] See *In re Dodson,* supra, 214 Conn. 359–60; *Naunchek* v. *Naunchek,* 191 Conn. 110, 114, 463 A.2d 603 (1983); see also *United States* v. *Allocco,* 994 F.2d 82, 85 (2d Cir. 1993); *United States* v. *Lumumba,* 794 F.2d 806, 810 (2d Cir. 1986); *In re Gustafson,* 650 F.2d 1017, 1020 (9th Cir. 1981); *Pennsylvania* v. *Local Union 542,* 552 F.2d 498, 509 (3d Cir.), cert. denied, 434 U.S. 822, 98 S. Ct. 67, 54 L. Ed. 2d 79 (1977); *United States* v. *Seale,* 461 F.2d 345, 371 (7th Cir. 1972).

B

Second Contempt Finding

We do not believe, however, that the record supports the trial court's subsequent contempt findings. With respect to the second finding, the plaintiff, immediately after the court had sentenced him to three months imprisonment for the first contempt and as he was walking away, stated, "The court's disrespecting me." The court instructed the plaintiff to return to the bench and asked him what he had said, to which he responded, "I said I feel like I been disrespected." The court replied that the plaintiff had "disrespected the court again," and gave him the opportunity to explain why he should not be held in contempt a second time. After a very brief colloquy between the court and the plaintiff, the

[24] In his concurring and dissenting opinion, Justice Berdon suggests that even if a person repeatedly and deliberately disobeys a court's direct order that he or she stop speaking, that person's disobedience cannot provide the basis for a summary contempt finding. We simply disagree with this unsupported and, in our view, unsupportable proposition. See Practice Book § 986 ("[t]he judicial authority may punish by fine or imprisonment or both . . . (4) [a]ny person disobeying in the course of a civil or criminal proceeding *any order of a judicial authority*" [emphasis added]), and § 988 ("[a] criminal contempt may be punished summarily if the conduct constituting the contempt was committed in the actual presence of the court or of the judicial authority and such punishment is necessary to maintain order in the courtroom").

court asked the plaintiff if he wanted to apologize, and the plaintiff did so. The court, satisfied that a further contempt finding was not warranted and that the hearing was concluded, stated, "I've heard enough." In the audiotape of the colloquy, Levy, the plaintiff's attorney, can then be heard telling the plaintiff, "Let's go," apparently advising him to leave the courtroom promptly and without further incident. When the plaintiff replied, "Yeah, okay," to Levy's suggestion, the court called the plaintiff back again and stated, "You're a wise guy." Although the plaintiff immediately replied, "I was talking to her," referring to Levy,[25] the court nevertheless told him that he again had been "disrespectful" and sentenced him to three more months in prison.

Because the plaintiff had been warned repeatedly to refrain from making any further comments, we have little doubt that, if the trial court had not asked for and accepted the plaintiff's apology, it would have been warranted in finding the plaintiff in contempt a second time for stating, "The court's disrespecting me." It is clear from the record, however, that the court had decided not to hold the plaintiff in contempt for that comment, instead eliciting the plaintiff's apology for the statement. Only after the court had concluded the hearing and the plaintiff had responded affirmatively to his attorney's entreaty that they both leave the courtroom did the court call him back and, without further inquiry, sentence him to an additional prison term of three months. Thus, it is apparent from the record that: (1) the court reversed its decision not to hold the plaintiff in contempt a second time because the court had concluded that the comment, "Yeah, okay," constituted an expression of the plaintiff's continued lack of respect for the court's instructions to refrain from speaking; and (2) the court's reason for reversing itself was predicated

---

[25] The state acknowledges the fact that the plaintiff was referring to his attorney.

upon a misapprehension as to why the plaintiff had spoken after the court had ordered him not to do so. Moreover, there is nothing in the record to suggest that the plaintiff's comment was accompanied by any inappropriate gestures, expressions or other type of body language.[26] In light of the fact that the comment that prompted the court to hold the plaintiff in contempt a second time was merely an affirmative response to Levy's advice that he leave the courtroom without further statement or incident, that comment cannot reasonably provide a basis for the trial court's conclusion that the plaintiff was continuing to be "disrespectful" and, therefore, that he was deserving of further punishment.

C

Third Contempt Finding

We reach the same conclusion with respect to the third and last contempt finding. After the court had found the plaintiff in contempt a second time and had sentenced him to three more months imprisonment, the plaintiff stated, "Uh hum, yup." The court then asked the plaintiff if he wanted more time, to which the plaintiff responded, "Do whatever you like." The court proceeded to hold the plaintiff in contempt a third time and sentenced him to three additional months in prison.

The plaintiff's claim that this conduct is insufficient to support the trial court's contempt finding must be viewed in light of what immediately had preceded it: the trial court had just held the plaintiff in contempt for a second time based on its misperception that the

---

[26] We emphasize that, in the event that a court's contempt finding is based in whole or in part on such inappropriate body language or on any other conduct not clearly apparent from the record, it is incumbent upon the court to make an express finding on the record detailing such conduct. See Practice Book § 988 ("[a] judgment of guilty of contempt shall include a recital of those facts on which the adjudication of guilty is based").

plaintiff again had wilfully disobeyed its order to refrain from speaking. Moreover, when the trial court asked the plaintiff to come back, just prior to its second contempt finding, the plaintiff immediately attempted to explain that he had been responding to his lawyer. The trial court, however, acting upon its mistaken belief that the plaintiff simply had been continuing to behave in a contemptuous manner, ignored the plaintiff's explanation and immediately sentenced him to three more months in prison. Consequently, the plaintiff reasonably believed that the second contempt finding and prison term were unwarranted.

It was at this point that the plaintiff muttered, "Uh hum, yup," prompting the court to call him back and ask, "[Do] [y]ou want more?" When the plaintiff replied, "Do whatever you like," the court again found the plaintiff in contempt. We need not decide whether, under other circumstances, the plaintiff's utterance might have provided the basis for a summary criminal contempt finding. For the following reasons, we conclude that the plaintiff's remark cannot support such a finding in this case. First, the plaintiff had just been held in summary contempt for a second time and sentenced to three months imprisonment based upon the trial court's mistake of fact. Second, the court previously had failed to afford the plaintiff a meaningful opportunity to correct the court's misunderstanding as to his conduct. Third, it is apparent that the court was angry with the plaintiff for what the court believed was his wilful disobedience to the court's order to refrain from speaking after the court had accepted the plaintiff's apology and attempted to conclude the proceedings.[27] Finally, the plaintiff's remark was exceedingly brief, and neither profane nor provocative. When examined in this context, it is apparent that: (1) the plaintiff's comment,

[27] It is clear from the court's tone of voice that the court was angry with the plaintiff.

"Uh hum, yup," was an understandable reaction to an unwarranted contempt finding and three month prison sentence; cf. *United States* v. *Seale*, 461 F.2d 345, 371 (7th Cir. 1972) ("automaton-like reflexive obedience to the court's orders" cannot be required; court must not "expect unhuman responsiveness. A certain amount of leeway must be allowed."); and (2) the court's reaction to that utterance necessarily was affected by its misunderstanding of the events that had immediately preceded it. Furthermore, the record is devoid of any indication that the statement "Uh hum, yup" was accompanied by any gestures or other inappropriate body language. See footnote 25 of this opinion. Under such circumstances, we conclude that the plaintiff's utterance, without more, could not have provided a sufficient basis for the court's finding of criminal contempt.

We further conclude that the plaintiff's statement, "Do whatever you like," in response to the court's question, "[Do] [y]ou want more [time]?," provides no independent or additional support for the court's final contempt finding. Although the plaintiff's answer could have been more diplomatic, his response cannot be characterized as either inflammatory or unresponsive. As such, it simply was not so offensive to the dignity or the authority of the court as to be contemptuous. See *In re Little*, 404 U.S. 553, 555, 92 S. Ct. 659, 30 L. Ed. 2d 708 (1972) ("[t]rial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice"). This conclusion is further buttressed by the fact that the plaintiff's effort to explain why he should not be held in contempt a second time went unheeded by the trial court. We note, finally, that the plaintiff's tone of voice fairly may be described as resigned rather than caustic or sarcastic. For these reasons, we conclude that the third contempt finding cannot stand.[28]

---

[28] Although a further colloquy between the court and the plaintiff ensued, that colloquy did not result in a finding of contempt.

Because "[i]t is evident that the authority of the court in this case was significantly hindered" by the plaintiff's wilful disobedience to the court's initial commands that the plaintiff stop talking; *In re Dodson*, supra, 214 Conn. 359; we reject the plaintiff's claim that the first contempt finding was not factually supported. We conclude, however, that the record does not support the second and third contempt findings and, consequently, that they must be vacated.

### III

The plaintiff next claims that the trial court should have disqualified itself and referred the matter to another judge. Specifically, the plaintiff contends that the court became so personally involved in the controversy that fundamental fairness required the court to recuse itself so that another judge could determine whether the plaintiff's conduct was contemptuous. We disagree.[29]

"[In] *Mayberry* v. *Pennsylvania*, [400 U.S. 455, 465–66, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)], [the United States Supreme Court] held . . . that the fair administration of justice disqualifies a judge from sitting in judgment on a contempt charge if he has become so personally embroiled with a contemnor that it is unlikely for him 'to maintain that calm detachment necessary for fair adjudication.' " *Naunchek* v. *Naunchek*, supra, 191 Conn. 116–17. In general, in order to determine whether a judge was required to recuse him or herself due to personal embroilment, "we must appraise both the conduct of the contemnor and the reaction of

---

[29] The state maintains that we should not review this claim because it was not raised in the trial court. We previously have decided to reach the merits of such a claim even though it was not raised below. *Jackson* v. *Bailey*, supra, 221 Conn. 515; *In re Dodson*, supra, 214 Conn. 368. In light of the summary nature of the proceedings and the adequacy of the record for purposes of review, we also decide to reach the merits of the plaintiff's claim in this case.

the judge. While personal embroilment is a more likely reaction when the contemnor has mounted a personal attack on the judge, it may also be found in the character of the judge's response, if the judge has become visibly involved in a running controversy with the contemnor. '[T]he inquiry must be . . . whether there was "such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." . . .' " (Citation omitted.) *Naunchek* v. *Naunchek*, supra, 118, quoting *Taylor* v. *Hayes*, supra, 418 U.S. 501. Consequently, judicial recusal is necessary only in the unusual case where the apparent effect of the contemnor's conduct on the judge against whom the contemptuous conduct was levied is such as to indicate that the judge's impartiality or objectivity reasonably may be called into question. See *State* v. *Murray*, 225 Conn. 355, 366, 623 A.2d 60, cert. denied, 510 U.S. 821, 114 S. Ct. 78, 126 L. Ed. 2d 46 (1993) ("due process requires, *under certain extreme circumstances*, that a criminal contempt be heard by a judge other than the one who was the target of the contemptuous in-court conduct" [emphasis added]); 1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 6, standard 6-4.5 ("[t]he judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge if the original judge's conduct was so integrated with the contempt so as to have contributed to it or was otherwise involved, *or if the original judge's objectivity can reasonably be questioned*").

Our review of the record regarding the first contempt finding persuades us that the trial court was not so personally embroiled in a running controversy with the plaintiff that disqualification was required.[30] The plain-

---

[30] In light of our conclusion that the judgment must be reversed with respect to the second and third findings of contempt; see part II of this

tiff, though defiant of the court's authority, did not resort to the use of invective or otherwise engage in a personal attack upon the court. Furthermore, the trial court's initial response to the plaintiff's wilful refusal to refrain from speaking was appropriate: the court repeatedly instructed the plaintiff to stop talking; when he continued to speak, the court properly afforded him an opportunity to explain why he should not be held in contempt; and the court did not sanction the plaintiff with contempt until the plaintiff persisted in defying the court's orders during the hearing by insisting that he "need[ed] to be heard" after the court had told him to refrain from any further comment. The trial court had not become so personally embroiled in an ongoing controversy with the plaintiff that recusal was necessary to safeguard the plaintiff's due process rights.

## IV

The plaintiff also claims that the trial court lacked justification for exercising its summary contempt authority and, therefore, that he was entitled to a non-summary proceeding pursuant to Practice Book § 989.[31] We are not persuaded.

Practice Book § 988 expressly provides that a criminal contempt committed in the presence of the court may be punished summarily if "such punishment is necessary to maintain order in the courtroom . . . ." Because § 988 applies to conduct that actually occurs in the court's presence during an official court proceeding,

---

opinion; we need not reach the merits of the plaintiff's claim of embroilment insofar as it relates to those findings.

[31] Practice Book § 989 provides in relevant part: "[Criminal Contempt—Summary Contempt]—— Deferral of Proceedings

"Where the interests of orderly courtroom procedure and substantial justice so dictate, or where the conduct constituting the contempt is in the nature of a personal attack against the judicial authority, the judicial authority should defer institution of contempt proceedings until after the trial is completed . . . ."

we traditionally have afforded courts considerable lee-way in determining whether summary punishment is necessary under the particular circumstances of the case. See, e.g., *Jackson* v. *Bailey*, supra, 221 Conn. 504; *McClain* v. *Robinson*, 189 Conn. 663, 669, 457 A.2d 1072 (1983). Moreover, we have not limited the court's exercise of its summary contempt authority to trials but, rather, have approved its use in a variety of settings, including probable cause hearings; *Wilson* v. *Cohen*, 222 Conn. 591, 594–95, 610 A.2d 1177 (1992); bail hearings; *Jackson* v. *Bailey*, supra, 501; and sentencing proceedings. *In re Dodson*, supra, 214 Conn. 356.

We are satisfied that, when it opted to exercise its summary contempt power under § 988 in the present case, the trial court did not abuse its discretion. The court reasonably concluded that the plaintiff's wilful disobedience of its orders posed an imminent threat to the dignity of the court and to the orderly administration of justice. See *Naunchek* v. *Naunchek*, supra, 191 Conn. 114 (contemnor's disregard of court's repeated instructions regarding limits of permissible examination warranted summary contempt finding). Moreover, we agree with the state that in acting summarily, the trial court demonstrated that it was fully prepared to enforce its orders decisively and deter future "occurrence[s] of similar derelictions" by the plaintiff and others. *In re Dodson*, supra, 214 Conn. 351. Although "[w]e are mindful of the oft-quoted statement of Justice Robert Jackson in *Sacher* v. *United States*, 343 U.S. 1, 8, 72 S. Ct. 451, 96 L. Ed. 717, reh. denied, 343 U.S. 931, 72 S. Ct. 746, 96 L. Ed. 1341 (1952), that '[s]ummary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes' "; *Naunchek* v. *Naunchek*, supra, 117; it is equally true that "[a] trial court must have latitude in the preservation of courtroom control." Id. Consequently, as long as the

record reasonably supports a trial court's exercise of its authority under § 988, we will not substitute our own view regarding the court's use of its summary contempt power.[32] Accordingly, we reject the plaintiff's claim that he was entitled to a nonsummary adjudication of the first contempt finding.

The judgment is affirmed with respect to the first contempt finding. The judgment is reversed with respect to the second and third contempt findings, and the case is remanded to the trial court with direction to vacate the second and third contempt findings.

In this opinion BORDEN, J., concurred, BERDON, J., concurred as to parts I and II C and concurred in the result as to part II B, and DUPONT, J., with whom MCDONALD, J., joined, concurred as to parts I, II A, III and IV.

BERDON, J., concurring in part and dissenting in part. This case involves issues which go to the perception of justice and the doing of justice in our courts, namely, the jurisdiction of a trial judge summarily to hold and punish a person for contempt of court. In other words, this case concerns the power of a trial judge summarily to punish for contempt when the *victim* of the alleged contemptuous conduct is the court "represented" by the trial judge, and that same trial judge serves the function of prosecutor, jury and sentencer. It is an awesome power to be invoked only when absolutely necessary for the administration of justice. Indeed, when the trial court exercises its powers of summary criminal contempt, several constitutional guarantees at the core of our democracy are compromised.

---

[32] It also bears noting that counsel for the plaintiff, who was present during the entire hearing on the plaintiff's application for a reduction of bail, could have requested that the court proceed in a nonsummary manner or that the court otherwise reconsider the punishment imposed on the plaintiff.

The United States Supreme Court has underscored that the power of *summary* contempt must be sparingly used for the sole purpose of controlling the contemnor who interferes with the administration of justice and not to protect the dignity of the court or the vanities of the trial judge. "Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." (Internal quotation marks omitted.) *In re Little*, 404 U.S. 553, 555, 92 S. Ct. 659, 30 L. Ed. 2d 708 (1972). As this court stated in *In re Dodson*, 214 Conn. 344, 354, 572 A.2d 328, cert. denied, 498 U.S. 896, 111 S. Ct. 247, 112 L. Ed. 2d 205 (1990), "[a] court of law is not the personal fiefdom of the individual who happens to be sitting at the bench." (Internal quotation marks omitted.) Put simply, the black robe does not transform the judge from a public servant, charged with dispensing justice, into a despot.

I recognize that "[t]he power of [both summary and nonsummary] contempt which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed to avoid arbitrary or oppressive conclusions." (Internal quotation marks omitted.) *Mayberry* v. *Pennsylvania*, 400 U.S. 455, 464, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971).

The crime of summary contempt must not be confused with that of nonsummary contempt. Although both are criminal proceedings, the distinction is of vital importance because conduct that may be the subject of a nonsummary contempt proceeding may not give rise to a summary contempt proceeding. We tolerate the compromise of a contemnor's constitutional rights in a summary contempt proceeding in order to allow trial courts to control the courtroom in furtherance of the administration of justice. Nonsummary contempt,

prosecuted before a neutral and detached judge, is available to protect the dignity of the court or when the trial judge has become so embroiled in the controversy that due process requires that he or she be disqualified. The court in *In re Dodson,* supra, 214 Conn. 351, and in Justice Palmer's opinion today, confuses the two types of contempt proceedings by relying on the following from *Young* v. *United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798, 107 S. Ct. 2124, 95 L. Ed. 2d 740 (1987), and applying it to summary contempt: "The underlying concern that gave rise to the contempt power was not . . . merely the disruption of court proceedings. Rather, it was disobedience to the orders of the judiciary, regardless of whether such disobedience interfered with the conduct of trial." *Young,* however, did not involve summary contempt proceedings, but, rather, it was a nonsummary contempt trial wherein the petitioner was found guilty of criminal contempt by a jury.

I disagree with part II A of Justice Palmer's opinion, which holds that the record supports the trial judge's first finding of contempt against Duane Banks, the plaintiff in error (plaintiff). I agree with the result reached in part II B and C of Justice Palmer's opinion with respect to reversing the second and third findings of contempt,[1] but I disagree with the reasoning he employed in reversing the second finding of contempt.

## I

I begin my analysis with the standard of review for *summary* criminal contempt. In making that determination, summary contempt cannot be equated with the ordinary criminal prosecution based on a crime committed away from the courtroom, which is prosecuted by the state before a neutral and detached judge. Rather,

---

[1] I also agree with part I of Justice Palmer's opinion, which holds that the two week limitation period contained in General Statutes § 52-273 does not implicate the subject matter jurisdiction of this court.

it is the trial judge that is at the core of the entire contempt proceeding, and that is the same judge who determines whether to initiate the proceedings for contempt and, if so, the punishment for such contempt.

Relying on *Jackson* v. *Bailey*, 221 Conn. 498, 504, 605 A.2d 1350, cert. denied, 506 U.S. 875, 113 S. Ct. 216, 121 L. Ed. 2d 155 (1992), and *McClain* v. *Robinson*, 189 Conn. 663, 669, 457 A.2d 1072 (1983), Justice Palmer's opinion rejects de novo review of the question of whether the conduct in this case constitutes the type of contemptuous behavior that can be the subject matter of a summary contempt proceeding. Rather, Justice Palmer concludes that our standard of review is that if "upon a careful review of the record, we conclude that the trial court reasonably could have found that the plaintiff's conduct was wilfully contumacious beyond a reasonable doubt," then its finding that the conduct constitutes contempt must stand. In other words, the trial court must be upheld with respect to whether the conduct constitutes contempt in a summary proceeding if we conclude beyond a reasonable doubt that the trial court reasonably could have found that the conduct was contemptuous. I am not quite certain what this standard of review means.[2] It does, however, sound suspiciously close to an abuse of discretion or deferential standard, which, in practice, Justice Palmer applies in this case.[3] Nevertheless, in my view, when reviewing a conviction for summary contempt it is required that we determine, on a de novo basis, whether the conduct

[2] I am also not quite certain what Justice Palmer means when he states in his opinion that we must determine whether the contemnor's conduct "was wilfully contumacious beyond a reasonable doubt." I agree that the conduct that the state claims constituted the contempt must be proven beyond a reasonable doubt. But how does this court determine the standard that was employed by the trial court?

[3] For example, in discussing the standard of review, Justice Palmer writes that "it is not our function . . . to second guess the considered judgment of the trial court . . . ."

was contemptuous and whether it was the proper subject of a summary proceeding.[4]

Justice Palmer's reliance on *Jackson* and *McClain* for his deference review is misplaced. *Jackson* referred to the " 'considerable discretion in dealing with contemptuous conduct' " and not with the determination of whether the speech constituted contempt. *Jackson* v. *Bailey*, supra, 221 Conn. 504. Likewise, in *McClain*, the court made reference to the same discretion. *McClain* v. *Robinson*, supra, 189 Conn. 669. In other words, in neither *Jackson* nor *McClain* did this court ever defer to the trial judge's determination of whether the conduct reached the level of contemptuous behavior.

In *Jackson* v. *Bailey*, supra, 221 Conn. 500, however, this court indicated that when a contemnor seeks appellate review the inquiry is grounded in three considerations,[5] one of which is "whether the designated conduct

[4] We must not confuse this de novo standard of review for determining whether the conduct constitutes contempt with the standard that should be applied to the findings of historical fact upon which the contempt is predicated. The standard of review for the historical facts is whether those findings of the trial court are clearly erroneous. So, for example, if the contemnor's conduct is based upon the physical movement of the contemnor's body in defiance, then the trial court's finding that the body movement was made must stand unless clearly erroneous. On the other hand, whether the contemnor's body movement constitutes contemptuous conduct is a legal question to be determined de novo by an appellate level court. Of course, the historical facts in the present case, found in the transcript and the audiotape, are not in dispute.

[5] "In a review of summary criminal contempt, the inquiry is limited to a determination of the jurisdiction of the court below. *Tyler* v. *Hamersley*, 44 Conn. 393, 413 (1877). Subsumed in this inquiry are three questions, namely, (1) whether the designated conduct is legally susceptible of constituting a contempt; *Goodhart* v. *State*, [84 Conn. 60, 63, 78 A. 853 (1911)]; (2) whether the punishment imposed was authorized by law; *State* v. *Jackson*, 147 Conn. 167, 169, 158 A.2d 166 (1960); and (3) whether the judicial authority was qualified to conduct the hearing. *Mayberry* v. *Pennsylvania*, [supra, 400 U.S. 465–66]." (Internal quotation marks omitted.) *Jackson* v. *Bailey*, supra, 221 Conn. 500–501.

is legally susceptible of constituting a contempt."[6] We recognized this in both *In re Dodson*, supra, 214 Conn. 346, and *McClain* v. *Robinson*, supra, 189 Conn. 667. In my view, this unmistakably means that we must determine, as a matter of law, whether we, as judges of an appellate tribunal, find the conduct to be contemptuous. Indeed, in *Goodhart* v. *State*, 84 Conn. 60, 63–64, 78 A. 853 (1911), this court held that it must determine " 'as a matter of law' " whether the conduct constituted contempt.

Because summary contempt implicates a contemnor's due process rights, federal constitutional law becomes very relevant. In my view, United States Supreme Court decisions clearly point in the direction of de novo review to determine whether the conduct in question, as a matter of law, can constitute contempt. See, e.g., *Codispoti* v. *Pennsylvania*, 418 U.S. 506, 517, 94 S. Ct. 2687, 41 L. Ed. 2d 912 (1974) ("[s]ummary convictions during trial that are *unwarranted by the facts will not be invulnerable to appellate review*" [emphasis added]), citing *Sacher* v. *United States*, 343 U.S. 1, 9, 72 S. Ct. 451, 96 L. Ed. 717 (1952). "When constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the evidence in the record." (Internal quotation marks omitted.) *Codispoti* v. *Pennsylvania*, supra, 517 n.6. In my opinion, the case of *In re Little*, supra, 404 U.S. 553, makes it clear that on appeal there must be a de novo review of the conduct to determine whether it constituted contempt. In that case, the defendant, while he was representing himself, made comments in his closing argument that the trial judge was biased, had prejudged the case, and that he, the defendant, was a political prisoner. Id., 554. The trial

---

[6] To be "susceptible" in this context simply means "capable" of constituting contempt. See Black's Law Dictionary (6th Ed. 1990) (susceptible defined as "capable").

judge found him in criminal contempt because the comments "reflected on the integrity of the Court and tended to subvert and prevent justice." (Internal quotation marks omitted.) Id., 554–55. In overturning this state summary criminal contempt conviction, the United States Supreme Court held, as a matter of law, that "in the context of [that] case [the] petitioner's statements did not constitute criminal contempt." Id., 555. In other words, its review was *de novo*.

In *Eaton* v. *Tulsa*, 415 U.S. 697, 698, 94 S. Ct. 1228, 39 L. Ed. 2d 693 (1974), the Supreme Court overturned a state criminal contempt conviction and held, as a matter of law, that the "single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt." The expletive of "chicken shit" was made by the alleged contemnor while he was testifying in response to a question on cross-examination and it was "a characterization of the person whom [the contemnor] believed assaulted him." Id., 700 (Powell, J., concurring). The Supreme Court, exercising what amounted to de novo review, reversed the conviction and indicated that in order for the conduct to support a contempt conviction it must "constitute an imminent, not merely a likely, threat to the administration of justice." Id., 698.

As the Supreme Court noted in *Harris* v. *United States*, 382 U.S. 162, 164, 86 S. Ct. 352, 15 L. Ed. 2d 240 (1965), summary criminal contempt adjudication is "reserved for *exceptional circumstances* . . . such as acts threatening the judge or disrupting a hearing or obstructing court proceedings. . . . We reach that conclusion in light of the concern long demonstrated by both Congress and this Court over the possible abuse of the contempt power . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) Indeed, in *Harris*, in the context of a witness refusing

to answer questions before a grand jury, the Supreme Court reversed a district court judge's summary criminal contempt conviction on the ground that "[i]n the instant case, the dignity of the court was not being affronted: no disturbance had to be quelled; no insolent tactics had to be stopped." Id., 165. The court remanded the case for a nonsummary contempt adjudication in order to afford the witness the procedural safeguards present in a criminal case—i.e., notice and opportunity to be heard, the possible right to a jury trial, and the possible disqualification of the judge who cited the witness for contempt. Id., 165–67.

I also believe a de novo review is required for two other reasons. First, the nature of summary contempt requires this searching review. Because we compromise due process and other constitutional protections by allowing this summary criminal proceeding to be utilized, and so much power is invested in the trial judge, our review of whether the facts of the case constitute contemptuous behavior requires the more exacting de novo review. "[T]he absence of procedural safeguards at the adjudicatory phase makes appellate review the most important safeguard against abuses of the summary contempt power." R. Kuhns, "The Summary Contempt Power: A Critique and a New Perspective," 88 Yale L.J. 39, 119 (1978).

Second, de novo review is required, as the plaintiff argues, in order to produce "a unitary measure from which the judges will then be able to know where to draw the lines [with respect to] contemptuous behavior or conduct." This "[i]ndependent review is . . . necessary if appellate courts are to maintain control of, and to clarify the legal principles" involved in contempt cases. Cf. *Ornelas* v. *United States*,    U.S.    , 116 S. Ct. 1657, 1662–63, 134 L. Ed. 2d 911 (1996) (holding that "as a general matter determinations of reasonable suspicion and probable cause should be reviewed de

novo on appeal"); see also *State* v. *Geisler*, 222 Conn. 672, 694, 610 A.2d 1225 (1992) (holding that in reviewing trial court's ruling on motion to suppress, historical facts found by trial court will not be disturbed unless clearly erroneous, but trial court's legal conclusion will be reviewed de novo). In my view, and as the plaintiff argues, the reasoning in cases such as *Ornelas* and *Geisler* apply equally to an appellate court's review of a trial judge's contempt finding. In other words, we must review the trial court's finding of contempt as a legal conclusion, and we must review that conclusion de novo. In *Ornelas* v. *United States,* supra, 1662, the court was concerned that "[a] policy of sweeping deference would permit, [i]n the absence of any significant difference in the facts, the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general conclusions that the facts are sufficient or insufficient to constitute probable cause. . . . Such varied results would be inconsistent with the idea of a unitary system of law." (Citation omitted; internal quotation marks omitted.) I share these concerns in the present case as applied to summary contempt adjudication.

In summary contempt, no procedural safeguards are present because of the nature of the proceeding, and that should beckon us to make a searching inquiry upon reviewing the findings of contempt. Because a trial judge has wide discretion to invoke his or her summary contempt power under Connecticut law, instead of choosing nonsummary adjudication that affords the contemnor the same procedural safeguards as in any other criminal case, this court's review of the contempt findings must have more bite than a deferential standard of review.

## II

Nevertheless, under any standard of review—abuse of discretion, de novo, or something in between—the

record does not support a finding for the first contempt. In this matter, we have a complete record of what occurred before the trial judge. Not only do we have the transcript of the colloquy between the plaintiff and the trial judge, which led to the contempt findings, we also have the audiotape of the official court monitor, which was also made part of the record. Unfortunately, I am unable to broadcast the audiotape through this concurring and dissenting opinion, however, listening to it is revealing. The plaintiff addressed the trial judge in normal and polite tones throughout the proceeding. The only person whose voice was elevated, which clearly demonstrated a sense of anger, was the trial judge.

A brief summary of the facts is necessary to put the plaintiff's appeal in the context of the situation that occurred at the trial court. On May 2, 1995, the plaintiff was charged with several robbery and assault related charges. Because he could not post bail that was set at $500,000, he was incarcerated pending his trial. On June 7, 1995, the trial court reduced his bail to $300,000, but the plaintiff was also unable to satisfy the reduced bail. Judge Espinosa presided over this motion and she is the trial judge embroiled in the present controversy before this court. Subsequently, the plaintiff filed another motion for bail reduction, which was denied on July 26, 1995 by a different trial judge.

On November 17, 1995, the plaintiff filed another motion for bail reduction, which was heard by Judge Espinosa. The plaintiff's attorney argued in support of the bail reduction motion, claiming that, inter alia, the plaintiff had been incarcerated for approximately seven months, that his family could post a $35,000 bond, that he was able to return to the residence where he had been living with his girlfriend, and that he would wear an electronic monitor. The state opposed the motion and represented to the judge that the plaintiff had a

prior conviction for escape, two prior convictions for failure to appear, and that he had violated probation twice. The state also argued that the plaintiff had given a written confession with respect to his involvement in the robbery. The plaintiff's attorney countered that the plaintiff planned to contest the legality of the alleged confession in the future, that the state's records were inaccurate insofar as they indicated that the plaintiff had two failure to appear convictions, and that the plaintiff's other previously proposed conditions for reduction in bail would ensure his later appearance in court. The trial judge summarily denied the plaintiff's motion.

In an attempt to explain the inaccuracy in the state's records with respect to a prior conviction for failure to appear, and to explain that he had not confessed to the crimes with which he was presently charged, the following colloquy between the trial judge and the plaintiff preceded the first finding of contempt:

"The [Plaintiff]: I don't get a chance to speak?

"The Court: I would recommend that you talk to your lawyer because anything you say can and will be used against you.

"The [Plaintiff]: I'm well aware of that, Your Honor.

"The Court: All right, what would you like to say?

"The [Plaintiff]: I would like to say first of all that the last failure to appear conviction from 1989, I was incarcerated and that had been—

"The Court: But you pled guilty to it anyway?

"The [Plaintiff]: No, that had been clarified so that shouldn't even be on the record for one. And the last valid failure to appear that I had is over ten years old in which case also I know that's not an issue here, it's just that it does exist. However, I am a different person

from then, because everybody does change. And as far as a flight risk, that's nonsense because like my counselor's already asked and before the court I would be willing to post a bond, I would be on a monitor, there would be a sufficient amount of real estate put up, so—

"The Court: Mr. Banks, if you're just going to repeat what your lawyer said I heard her—

"The [Plaintiff]: Yeah.

"The Court: I considered her arguments and I denied it.

"The [Plaintiff]: All right, well—

"The Court: So if you have anything new to say I'll listen but I don't want—

"The [Plaintiff]: All right.

"The Court:—to hear her arguments rehashed.

"The [Plaintiff]: Well let me just go here then, isn't the purpose of bond only to ensure the—that I show up for court?

"The Court: That's correct.

"The [Plaintiff]: But I'm just a regular individual from the north end, I'm not a professional athlete or anything. Three hundred thousand dollars is ridiculous, you might as well say that don't give me a bond at all because you know, he knows and everybody else knows that I can't make a bond like that, therefore—

"The Court: Well, the court—

"The [Plaintiff]: You're not even giving me the opportunity to post a bond—

"The Court: I've heard enough. Do not say one more word. The court has considered all of the circumstances and has ruled.

"The [Plaintiff]: All right and I just would like—

"The Court: That's all.

"The [Plaintiff]:—it to be on the record that I never—

"The Court: I don't want to hear anything else.

"The [Plaintiff]:—did confess to any crime.

"The Court: I don't want to hear anything else.

"The [Plaintiff]: I never confessed to any crime—

"The Court: Be quiet—

"The [Plaintiff]: And I'm not making no changes—

"The Court:—or I'm going to hold you in contempt.

"The [Plaintiff]:—in my statement, either.

"The Court: Come back here.

"The [Plaintiff]: What?

"The Court: I want you to show cause why you should not be held in contempt for speaking after I told you not to. What's your explanation?

"The [Plaintiff]: Because I've been incarcerated for eight months listening to him—

"The Court: I don't care.

"The [Plaintiff]:—and other people—

"The Court: I don't care. That doesn't give you the right to come in here and—

"The [Plaintiff]:—making—

"The Court:—think that you're going to take over this courtroom.

"The [Plaintiff]: I'm not trying to take over, but I been quiet so long, I feel like I need to be heard.

"The Court: I want you to be quiet.

"The [Plaintiff]: I need to be heard.

"The Court: I want you to be quiet.

"The [Plaintiff]: I need to be heard. I'm tired of—

"The Court: The court finds that you have violated the court's order to stop talking when you were ordered to. That you have demonstrated a flagrant disrespect for this court and the court is going to hold you in contempt. You are hereby sentenced to three months. That's all."

In the colloquy between the trial judge and the plaintiff, the plaintiff was attempting to persuade the trial judge to reduce his appearance bond. This included the plaintiff's attempt to explain to the trial judge that setting an appearance bond in the amount of $300,000 was, for a person in his position, like setting no bond at all. From that point on in the colloquy, it appears that the trial judge became irritated with the plaintiff. The plaintiff, apparently walking away from the bench because the hearing had concluded, stated, with reference to his denial that he confessed to the crime: "And I'm not making no changes . . . in my statement, either." That statement was overlapped by the trial judge's admonishment to the plaintiff to "[b]e quiet . . . or I'm going to hold you in contempt." At that point, the trial judge then asked the plaintiff to show cause why he should not be held in contempt of court. The remainder of the colloquy, with respect to the first alleged contempt, was in response to the show cause order, and cannot be the foundation for the finding of contempt.

The foregoing does not constitute contemptuous behavior—that is, the plaintiff's statement as he was walking away from the bench that he was "not making no changes . . . in [his] statement, either." Indeed, in the entire colloquy, the plaintiff's words were not words

of contempt. In response to the plaintiff's request to speak, which was presented in the form of the question "I don't get a chance to speak?", he was invited to do so by the trial judge as evidenced by the judge's statement, "[a]ll right, what would you like to say?" Unboisterously, the plaintiff attempted to explain his predicament. Although he spoke after the judge had stated that she had "heard enough" and told the plaintiff to "not say one more word," what followed did *not* constitute contemptuous conduct. The plaintiff's statement in *totality* from that point to the time he was ordered to show cause why he should not be held in contempt was as follows: "All right and I just would like . . . it to be on the record that I never . . . did confess to any crime. . . . I never confessed to any crime . . . and I'm not making no changes . . . in my statement, either." That is not contempt. The trial court made no finding that the plaintiff's words constituted an imminent threat to the administration of justice and Justice Palmer is unable to point to anything in the record to support such a finding.[7]

---

[7] Although I agree with Justice Palmer that the second and third findings of contempt must be reversed, I disagree with the reasoning he employed in part II B of his opinion with respect to the second finding of contempt. In my view, the conduct upon which the second contempt was predicated is not contemptuous under any standard of review. The following colloquy begins with the first finding of contempt and is followed by the second and third findings of contempt.

"The Court: The court finds that you have violated the court's order to stop talking when you were ordered to. That you have demonstrated a flagrant disrespect for this court and the court is going to hold you in contempt. You are hereby sentenced to three months. That's all.

"The [Plaintiff]: The court's disrespecting me.

"The Court: All right, come back here again. What was that?

"The [Plaintiff]: I said I feel like I been disrespected.

"The Court: Now you have disrespected the court again. Now I want you to show cause why you should not be held in contempt for more time.

"The [Plaintiff]: Because don't I have the right to speak?

"The Court: No, not when I tell you not to.

"The [Plaintiff]: I would—

"The Court: Do you want to apologize?

In *In re Little*, supra, 404 U.S. 553, like in this case, the words of the contemnor were not uttered in a boisterous tone nor was there any finding that they disrupted the court proceedings. The court in that case, holding that there was no criminal contempt, stated as follows: "There is no indication, and the [s]tate does not argue, that petitioner's statements were uttered in a boisterous

"The [Plaintiff]: Yeah, I'll apologize.

"The Court: All right—

"The [Plaintiff]: But after that can I still speak?

"The Court: No. I've heard enough—

"[Plaintiff's Counsel]: Let's go . . . (inaudible) okay?

"The Court: That's it.

"[Plaintiff's Counsel]: (inaudible) Okay?

"The [Plaintiff]: Yeah, okay.

"The Court: No, come back here. You're a wise guy—

"The [Plaintiff]: I was talking to her.

"The Court: You're disrespectful. Three more months. That's it.

"The [Plaintiff]: Uh hum, yup.

"The Court: You want more?

"The [Plaintiff]: Do whatever you like.

"The Court: Come back. The court finds that you have been disrespectful again, repeatedly. Three more months. That's all."

With respect to the second contempt finding, Justice Palmer's opinion states that "[b]ecause the plaintiff had been warned repeatedly to refrain from making any further comments, we have little doubt that, if the trial court had not asked for and accepted the plaintiff's apology, it would have been warranted in finding the plaintiff in contempt a second time for stating, '[t]he court's disrespecting me.' " I find it hard to believe that those words can amount to contempt. Prior to the colloquy set forth in this footnote, and as already quoted in this opinion, the plaintiff was pleading with the trial court to allow him to be heard.

I also disagree with the reasoning employed by Judge Dupont in her concurring and dissenting opinion in which she indicates that the third finding of contempt should be upheld. I find it hard to accept that the plaintiff's statements "[u]h hum, yup" or "[d]o whatever you like" can constitute contempt. Furthermore, in response to a direct question asked by the trial judge, namely, "[y]ou want more?", the plaintiff answered "[d]o whatever you like." Contrary to Judge Dupont's assertion, this answer to the direct question posed by the trial judge cannot be contemptuous. In addition, and also contrary to Judge Dupont's assertion, the statement by the plaintiff that "this ain't no courtroom" made *after* he had been found in contempt for the third time cannot be, and was not, the basis for the third contempt. See footnote 9 of this opinion. So, that would leave the statement "[u]h hum, yup" as the basis of the third finding of contempt.

tone or in any [way] actually disrupted the court proceeding." Id., 555. The United States Supreme Court carefully indicated that "[t]he vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil . . . . Judges are supposed to be men [and women] of fortitude, able to thrive in a hardy climate. . . . Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice." (Citation omitted; internal quotation marks omitted.) Id.; see also *Holt* v. *Virginia*, 381 U.S. 131, 136, 85 S. Ct. 1375, 14 L. Ed. 2d 290 (1965) (in finding that contemnor's conduct did not constitute contempt, court stated that "[i]t is not charged that the petitioners here disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties"); *In re Dodson*, supra, 214 Conn. 353–54 ("A judge . . . should conduct himself [or herself] at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. . . . The trial judge should be the exemplar of dignity and impartiality. . . . [Judges] must be on guard against confusing offenses to their sensitivities with the obstruction of justice." [Citations omitted; internal quotation marks omitted.]).[8]

---

[8] In her concurring and dissenting opinion, Judge Dupont states that "this case is similar to *Jackson* . . . ." The conduct in the present case is not even within the same realm as the flagrant conduct and speech in *Jackson* v. *Bailey*, supra, 221 Conn. 498, and listening to the audiotape, or even just reading the colloquy, makes that abundantly clear.

The only similarity between the two cases is that the trial judges in each case imposed three successive judgments of contempt. The first finding of contempt in *Jackson* was predicated on a statement by the contemnor made after the trial judge had him returned to the courtroom as a result of his boisterous conduct when he previously left the courtroom. The trial judge

Furthermore, in the present case, the plaintiff's clear emotional involvement in the outcome of his bail reduction hearing should have caused the trial judge to give the plaintiff wider latitude in his statement, a statement that the trial judge gave him permission to make. See *In re Little*, supra, 409 U.S. 555 (pro se defendant was "clearly entitled to as much latitude in conducting his defense as . . . is enjoyed by counsel vigorously espousing a client's cause"); 1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 6, standard 6-3.9, p. 6.47, commentary ("Although a pro se defendant cannot be held to the same standards of decorum or competence expected of a member of the bar, such a defendant's activities should not be immune from the court's control. The sanctions of removal or contempt, on the other hand, will usually be inappropriate, since the misconduct of a pro se defendant will frequently be a blend of ignorance, emotional involvement, and a mounting recognition of the inadequacy of the defense.").

### III

Even if the words of the plaintiff could be considered contemptuous, the state has failed to demonstrate that the plaintiff had the necessary intent. See *In re Dodson*, supra, 214 Conn. 359 ("[t]o be held in criminal contempt, a contemnor must have the requisite intent; the conduct must be willful"). I agree, of course, with the portion of Justice Palmer's opinion that provides that intent can be proven by inference. Justice Palmer's opinion,

had the contemnor brought back in order to remind him that he was in a courtroom. The contemnor stated: "I wouldn't give a fuck about your courtroom. I would just like to—" *Jackson* v. *Bailey*, supra, 221 Conn. 501 n.2. The second finding of contempt in *Jackson* was based upon the following statement to the trial judge in response to the contemnor receiving ninety days for the first finding of contempt: "Suck my dick for giving me another ninety days." Id., 501–502 n.2. The third finding of contempt in *Jackson* was based upon the following statement by the contemnor to the trial judge in response to his receiving six months for the second finding of contempt: "Fuck your mother with a stick." Id.

however, fails to cite to facts or circumstances in which such an inference of intent can be drawn. The reason for that failure is simply that there are no facts or circumstances upon which a reasonable inference could be drawn. The plaintiff was merely attempting, in an unboisterous manner—indeed, in a polite fashion—to set the record straight, as he saw it, in order to obtain his freedom by having his appearance bond reduced.

## IV

Finally, the trial judge should have disqualified herself because of her personal embroilment in the matter. "While personal embroilment is a more likely reaction when the contemnor has mounted a personal attack on the judge, it may also be found in the character of the judge's response, if the judge has become visibly involved in a running controversy with the contemnor. . . . In making this ultimate judgment, the inquiry must be not only whether there was actual bias on [the trial judge's] part, but also whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." (Citation omitted; internal quotation marks omitted.) *Jackson* v. *Bailey*, supra, 221 Conn. 516. In *Naunchek* v. *Naunchek*, 191 Conn. 110, 116–17, 463 A.2d 603 (1983), this court stated: "In our interpretation of our contempt statutes, we must . . . take account of constitutional principles of due process that affect the adjudication of contempt. *Mayberry* v. *Pennsylvania*, [supra, 400 U.S. 465–66] held . . . that the fair administration of justice disqualifies a judge from sitting in judgment on a contempt charge if he [or she] has become so personally embroiled with a contemnor that it is unlikely for him [or her] 'to maintain that calm detachment necessary for fair adjudication.' Id., 465. We are mindful of the oft-quoted statement of Justice Robert Jackson in *Sacher*

v. *United States*, [supra, 343 U.S. 8], that '[s]ummary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes.' "

The embroilment in the present case is clearly demonstrated by the tone of the trial judge's voice and by her interruption of the plaintiff, when she stated: "I've heard enough. Do not say one more word." More importantly, after the trial judge had made three successive findings of contempt and imposed sentences totaling nine months, she attempted to entice the plaintiff to engage in further conduct that could have led to additional findings of contempt. In response to the plaintiff's comment that "this ain't no courtroom," the following colloquy occurred:

"The Court: *Come back. You want to keep doing this until you add up the time?*

"The [Plaintiff]: This will be the only conviction you get of me.

"The Court: *Do you want to add more time? We can do this all day and you'll be in jail longer than you will on the other charge. Shall we do it again?*"[9] (Emphasis added.)

---

[9] The entire colloquy regarding the occurrences after the trial judge's third finding of contempt was as follows:

"The [Plaintiff]: This—this ain't no courtroom.

"The Court: Come back. You want to keep doing this until you add up the time?

"The [Plaintiff]: This will be the only conviction you get of me.

"The Court: Do you want to add more time? We can do this all day and you'll be in jail longer than you will on the other charge. Shall we do it again?

"The [Plaintiff]: Are you comfortable now? You've given me about three (inaudible)—

"The Court: How much are we up to now, [Edward Narus, Assistant State's Attorney]?

"Mr. Narus: Nine months, Your Honor.

"The Court: Nine months? That's right, because this court will not tolerate disrespect. When I say do not talk, you do not talk. Now I gave you the

This clearly shows that the trial judge was personally embroiled in the controversy and for that reason, as well as the reasons previously noted, the adjudications of contempt cannot stand.

Accordingly, I agree with Justice Palmer's opinion that there must be a reversal of the second and third findings of contempt, however, I disagree that the first finding of contempt should be affirmed.

DUPONT, C. J., with whom MCDONALD, J., joins, concurring in part and dissenting in part. I would not reverse the trial court's judgment as to two of the counts of summary criminal contempt as discussed in part II B and C of the majority opinion. I, therefore, dissent, in part.

The appellate review in this summary criminal contempt judgment, brought by a writ of error, is limited to a determination of whether three jurisdictional requirements existed at the time the trial court rendered its judgment. These requirements are met if the particular conduct of the plaintiff in error, Duane Banks (plaintiff), underlying each finding of contempt was legally susceptible of constituting a contempt, if the punishment was authorized, and if the court was qualified to conduct the summary contempt procedure. See *Jackson* v. *Bailey*, 221 Conn. 498, 500, 605 A.2d 1350, cert.

courtesy of talking, which I don't to all defendants, and you were disrespectful. You continue to be disrespectful because you do not stop talking as you walk out of the courtroom. You continue to make disrespectful comments to the court. And as long as you continue to do that, the court will find you in contempt, do you understand that, sir? Do you understand that? I guess you don't understand that. So by your silence you're indicating that you are still being disrespectful because you will not answer the court's questions. Is that correct?

"The [Plaintiff]: Do you want me to talk or not?

"The Court: I want you to answer my question.

"The [Plaintiff]: Yeah, I understand that.

"The Court: All right. That's it."

The court then called the next case.

denied, 506 U.S. 875, 113 S. Ct. 216, 121 L. Ed. 2d 155 (1992); *In re Dodson*, 214 Conn. 344, 346–47, 572 A.2d 328, cert. denied, 498 U.S. 896, 111 S. Ct. 247, 112 L. Ed. 2d 205 (1990). If all three conditions are satisfied, the appellate inquiry ends, and the adjudication that a contempt has occurred must be upheld. *In re Dodson*, supra, 344; *McClain* v. *Robinson*, 189 Conn. 663, 457 A.2d 1072 (1983); *Moore* v. *State*, 186 Conn. 256, 440 A.2d 969 (1982); *Whiteside* v. *State*, 148 Conn. 77, 167 A.2d 450 (1961); *State* v. *Jackson*, 147 Conn. 167, 158 A.2d 166 (1990); *Goodhart* v. *State*, 84 Conn. 60, 78 A. 853 (1911); *State* v. *Melechinsky*, 36 Conn. Sup. 547, 419 A.2d 900 (1980).

A writ of error precludes any review of findings of fact. *State* v. *Assuntino*, 180 Conn. 345, 429 A.2d 900 (1980); *State* v. *Caplan*, 85 Conn. 618, 84 A. 280 (1912); *Goodhart* v. *State*, supra, 84 Conn. 60. Therefore, an adjudication that a contempt has been committed in the presence of a trial court is final and not reviewable where the three requisite jurisdictional requirements are present. *Tyler* v. *Hamersley*, 44 Conn. 393, 409 (1877). If there is jurisdiction, every court has the inherent power to adjudicate whether an act of contempt has been committed. Id., 411. The punishment must be immediate and peremptory, that is, final and conclusive. Id., 412. A court acts solely on the facts within its own knowledge and if there is jurisdiction, there can be no review of its conclusion that a contempt has occurred. *State* v. *Melechinsky*, supra, 36 Conn. Sup. 547.[1]

Summary criminal contempt proceedings are not "the functional equivalent" of those criminal prosecutions

---

[1] In contempt cases, the question of fact for a trial court with the requisite jurisdiction, which question cannot be reviewed, is whether the conduct of the plaintiff, in view of all of the surrounding circumstances, constituted a disruption, hindrance or obstruction of the administration of justice or whether the conduct detracted from the authority or dignity of the court. It is not necessary, however, for the conduct to be observed by or understood

in which the contemptuous acts are committed outside of the presence of the court in violation of a court order. *Moore* v. *State*, supra, 186 Conn. 259. In those types of contempt cases where the offender is not in court at the time of the alleged contemptuous acts, the judge can have no knowledge of the facts that constitute those acts except as are communicated to the judge by others. *Welch* v. *Barber*, 52 Conn. 147, 156 (1884). Those cases, unlike the summary criminal contempts committed in the presence of the court, therefore, require a trial for proof beyond a reasonable doubt of their facts. Only if the facts of the summary criminal contempts committed in the presence of the trial court could not constitute a contempt, that is, if they are not legally susceptible of being contemptuous, can a reviewing court revise the finding of the trial court. Id. All of the Connecticut cases cited in Justice Palmer's opinion affirm the proposition that findings of summary criminal contempts committed in the presence of a court for which the punishment is six months or less cannot be reviewed if the three jurisdictional requirements are met. *Jackson* v. *Bailey*, supra, 221 Conn. 498; *In re Dodson*, supra, 214 Conn. 344; *Moore* v. *State*, supra, 256; *Goodhart* v. *State*, supra, 84 Conn. 60; *Welch* v. *Barber*, supra, 147.

In this case, two of the requisite jurisdictional elements are satisfied because the punishment was authorized and the trial court was authorized to impose it summarily. See *Jackson* v. *Bailey*, supra, 221 Conn. 500. The only remaining issue is whether the plaintiff's conduct on the three occasions involved was legally susceptible of constituting a contempt. This determination rests on whether he disobeyed a legal order. Our review must be confined to whether the acts are capable of being construed as contemptuous, that is, legally susceptible of such construction, not whether the acts

by or to be audible to those in the courtroom in order for it to be found contemptuous. See *Whiteside* v. *State*, supra, 148 Conn. 80.

are in fact contemptuous, the latter being a finding of fact made by a trial court based on its conclusion as to motive, intent or good or bad faith of a plaintiff. It is that latter finding that cannot be reviewed. *Goodhart* v. *State*, supra, 84 Conn. 65–69.

In determining whether the conduct of the plaintiff on the three occasions was legally susceptible of constituting a contempt, it is important to note the following. This was not the first appearance of the plaintiff before this trial court. The trial court had reduced the plaintiff's bail, five months previously, from $500,000 to $300,000. A few moments prior to the contempts involved, the court, in a bail bond hearing, had denied a motion to reduce the plaintiff's bail to $35,000, after hearing argument of the plaintiff's counsel. The plaintiff then sought an opportunity to speak on his own behalf, which the court granted. The court listened to the plaintiff for a short time and then interrupted the plaintiff to say that he was repeating the arguments of his counsel that the court had already considered. The court also said that it would listen if the plaintiff had anything new to say, but that it did not want to hear the same arguments that counsel had already made. The plaintiff then implied that the court was prejudiced against him and was not dispensing justice evenly because he was "just a regular individual from the north end, I'm not a professional athlete or anything. Three hundred thousand dollars is ridiculous . . . ." The remark was made to a court that had already reduced his bond by $200,000 and that knew the plaintiff had a prior conviction for escape and two prior convictions for a failure to appear, and had been adjudicated in violation of probation twice. The court was also aware that the charges the plaintiff faced were robbery and assault, both in the first degree.

The trial court attempted to answer the plaintiff's remark but the plaintiff interrupted, at which time the

court advised him not to say one more word. The plaintiff, however, persisted in speaking, even after four more warnings to be quiet.

It is evident from the transcript that the plaintiff continued to talk, and then began to leave. The court told the plaintiff to "[c]ome back here" and asked him to show cause why he should not be held in contempt. The plaintiff continued to talk, and the court twice more asked him to be quiet. After the plaintiff continued to talk, the court found him in contempt and sentenced him to three months imprisonment. This exchange was the basis for the first contempt finding. Following a remark by the plaintiff that is audible but not understandable on the tape, the plaintiff said, "The court's disrespecting me." He began to leave again, not facing the court, and was muttering something because the court then said, "come back here again. What was that?" The court asked the plaintiff why he should not be held in contempt and the plaintiff persisted in speaking. The court gave him a chance to apologize, which the plaintiff did, but conditioned the apology on his claimed right to speak. Again, there is an inaudible remark, at which point we can infer that the plaintiff began to leave again because the court called the plaintiff back, and said that he was a "wise guy," and disrespectful. This colloquy preceded the second finding of contempt.

The last contemptuous act occurred when the plaintiff muttered to himself and said sarcastically, "Do whatever you like." He again began to leave when the court said, "Come back," whereupon the court found him in contempt a third time. After the third adjudication of contempt, the plaintiff said, "[T]his ain't no courtroom." The trial court summed up the plaintiff's behavior involved in the three findings of contempt by saying that the plaintiff was disrespectful because he did not stop talking as he walked out of the courtroom and continued to make disrespectful comments to the court.

This court had the tape of the proceeding available to it.[2] Background noise in the courtroom can be heard, and some of the remarks of the plaintiff or perhaps others are not understandable. It is clear that the trial court also did not always clearly hear what the plaintiff said. The court was aware, however, that the plaintiff was speaking inappropriately and not facing the bench.

An appellate review of multiple findings of contempt in order to determine if each act is discrete and susceptible of constituting a contempt, or is one continuous delict, is difficult to conduct because there is no inevitable result or conclusive test to resolve the matter. See *Jackson* v. *Bailey*, supra, 221 Conn. 512; see also *United States* v. *Seale*, 461 F.2d 345, 354 (7th Cir. 1972).

In this case, as in *Jackson* v. *Bailey*, supra, 221 Conn. 513–15, each contempt cannot be isolated entirely from the others because a general warning of the conduct to be avoided applies to successive acts of contempt. Also, the affront to the dignity of the court or to the administration of justice involves the cumulative effect of the behavior involved, particularly its contumacious aspect as observed by others in the courtroom.

This case is similar to *Jackson*, where this court upheld three separate contempts, found by the trial court in a thirty second time frame, for which a total punishment of fifteen months imprisonment was given. The temporal proximity of two of the contempts in *Jackson* must have been less than ten seconds, and the warning not to engage in the behavior was given only once.[3] The record here indicates that on the first occa-

---

[2] The court, the plaintiff, and perhaps the plaintiff's counsel, sometimes speak at once and "reasonable ears" could differ as to what was said.

[3] In *Jackson* v. *Bailey*, supra, 221 Conn. 498, the first contempt was found for using an obscenity in the courtroom. After one more obscenity, without any further warning by the court, the second contempt was found. The third contempt was found when the defendant uttered a third obscenity, again without any intervening comment of the court.

sion, as discussed in Justice Palmer's opinion in part II A, the plaintiff repeatedly and deliberately defied the trial court's explicit commands that he refrain from speaking and that, as a result, the plaintiff's outbursts caused an unwarranted delay in the resolution of his matter and other business before the court. This amounted to an obstruction of the orderly administration of justice.

The trial judge had the power, and indeed the duty, to control her courtroom at all times, not only on the first occasion. Our courtrooms are the very places from which the public order is to be maintained. This concern is all the more heightened where there are other people in the courtroom charged with criminal offenses and awaiting their cases. The trial court was required to convey the message to others that affronts to the court's authority will not be tolerated. This court should be careful to uphold the trial court's ability to control a criminal courtroom continuously. This is necessary for a sense of order in judicial proceedings. See *In re Dodson*, supra, 214 Conn. 349–50.

Here, the conduct involved in each of the three findings of contempt was legally susceptible of constituting a contempt, the punishment was authorized and the court was qualified to act. That is all that we may review. Until this case, there was no Connecticut case that reversed a summary criminal contempt finding of a trial court. See *Jackson* v. *Bailey*, supra, 221 Conn. 498; *In re Dodson*, supra, 214 Conn. 344; *Naunchek* v. *Naunchek*, 191 Conn. 110, 463 A.2d 603 (1983); *Moore* v. *State*, supra, 186 Conn. 256; *Whiteside* v. *State*, supra, 148 Conn. 77; *Goodhart* v. *State*, supra, 84 Conn. 60. In my opinion, this case does not afford any reason to deviate from that precedent.