******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GREGORY JOHNSON *v.* SUPERIOR COURT,
JUDICIAL DISTRICT OF TOLLAND,
GEOGRAPHICAL AREA
NUMBER NINETEEN
(SC 21074)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The plaintiff in error filed a writ of error, challenging his summary conviction of three counts of criminal contempt for certain conduct in which he had engaged during the trial on his petition for a writ of habeas corpus, specifically, repeatedly interrupting and directing racial slurs and other profanities at the court. He claimed that the trial court had deprived him of his right to due process by failing to postpone the proceeding at which he was convicted of and sentenced for summary criminal contempt and by failing to order that the contempt proceeding be held before a different judge. *Held*:

The plaintiff in error could not prevail on his claim that the trial court had violated his right to due process by failing to defer the contempt proceeding pursuant to the rule of practice (§ 1-17) setting forth various grounds for deferring a summary criminal contempt proceeding and by failing to order that the proceeding be held before a different judge.

The trial court's summary contempt proceeding substantially complied with the requirements of the rule of practice (§ 1-16) governing the procedure that a trial court must follow before holding an individual in summary criminal contempt, the record having established that the plaintiff in error had been warned about his behavior prior to the court's findings of contempt and that, prior to sentencing, the court had appointed counsel to represent the plaintiff in error, provided counsel with an opportunity to speak privately with him, and allowed both counsel and the plaintiff in error to be heard regarding the matter.

The trial court was not required to defer the summary contempt proceeding pursuant to Practice Book § 1-17, as the behavior of the plaintiff in error obstructed the orderly administration of justice, the court, with only minimal delay, imposed summary criminal contempt upon the plaintiff in error's commission of contumacious acts, and the plaintiff in error failed to present significant evidence demonstrating that the trial judge had become personally embroiled with the plaintiff in error.

Moreover, despite the plaintiff in error's repeated personal attacks on the trial court, the court did not become so personally embroiled in an ongoing

controversy with the plaintiff in error that recusal was necessary to safeguard the plaintiff in error's due process rights.

Furthermore, there was no merit to the plaintiff in error's claim that the trial court should have deferred the contempt proceeding because of his alleged medical issues and incompetency, which both the plaintiff in error and his counsel had conveyed to the trial court, as that court rejected the plaintiff in error's incompetency claim on the basis of its own observations of his behavior during the proceedings, and as counsel had failed to ask the trial court for a competency evaluation.

Argued March 5—officially released June 17, 2025

*Procedural History*

Writ of error from the Superior Court in the judicial district of Tolland, geographical area number nineteen, *Newson, J.*, concerning certain findings of criminal contempt. *Writ of error dismissed.*

*James E. Mortimer*, assigned counsel, for the plaintiff in error.

*Raynald A. Carre*, deputy assistant state's attorney, with whom, on the brief, was *Deann Varunes*, assistant attorney general, for the defendant in error.

*Opinion*

MULLINS, C. J. In this writ of error, the plaintiff in error, Gregory Johnson (plaintiff), challenges his conviction of three counts of criminal contempt for conduct he engaged in during his habeas trial. The plaintiff claims that the trial court[1] deprived him of his right to due process under the federal constitution by failing to postpone the summary criminal contempt proceeding to a later date and by failing to order that the hearing on contempt be held before a different judge. We disagree and, accordingly, dismiss the writ of error.

---

[1] Although the court was conducting a habeas proceeding, it was acting in the capacity of a trial court for the purpose of adjudicating the three counts of criminal contempt. We therefore refer to the court as the trial court throughout this opinion.

The following facts and procedural history are relevant. As a self-represented party, the plaintiff filed a petition for a writ of habeas corpus, alleging issues with his medical treatment while in the custody of the respondent, the Commissioner of Correction. After it addressed various pretrial motions, the trial court conducted the first day of the habeas trial on April 4, 2023.

On May 4, 2023, the trial court resumed the plaintiff's habeas trial. The hearing was held virtually, with the plaintiff, counsel and the witnesses all appearing on-screen. Several witnesses were present virtually and were prepared to testify. After the court asked the parties to identify themselves, the plaintiff identified himself as "Gregory Johnson, man. Everybody know[s] who I am. I don't got time for that."[2] Thereafter, the following colloquy occurred:

"The Court: Mr. Johnson, I'm going to tell you right now. You've been here. You know you need to identify yourself.

"The [Plaintiff]: I identified myself (indiscernible).

"The Court: Just do what you need to do, Mr. Johnson.

"The [Plaintiff]: I identified myself already, man. I ain't got time for that.

---

[2] The plaintiff and the court, *Newson, J.*, who was assigned to the habeas docket, had been involved in a variety of other matters in the past. The defendant in error, the Superior Court, judicial district of Tolland, geographical area number nineteen, included in its appendix to its brief the transcript from the April 4, 2023 hearing on the plaintiff's motion to recuse Judge Newson from the underlying habeas case. With the exception of that transcript, the transcripts of other proceedings that occurred before the May 4, 2023 hearing have not been made a part of the record. At oral argument, counsel for the plaintiff represented that there was nothing in these other matters that showed Judge Newson's animosity toward the plaintiff; rather, the other matters simply demonstrated that Judge Newson and the plaintiff knew each other prior to the hearing that resulted in the findings of contempt.

* * *

"The Court: All right. Mr. Johnson, one more, and the hearing is over for the day. You understand? You're not at—

"The [Plaintiff]: I don't care.

"The Court: You're not out in the yard, Mr. Johnson—

"The [Plaintiff]: I don't care.

"The Court: —with your buddies.

* * *

"The Court: [The plaintiff], clearly, has forgotten the decorum of the courtroom. It's a regular context with [the plaintiff's] believing he is talking to one of his friends in the yard as opposed to the court.

"The [Plaintiff]: I'm talking to Stephen—

"The Court: The matter is canceled.

"The [Plaintiff]: —a house nigger.

"The Court: The matter is canceled for today. I will ask the caseflow coordinator to reschedule the next day of this matter in ninety days.

"The [Plaintiff]: Care about you. You're a house nigger.

"The Court: Maybe [the plaintiff] will remember his decorum in the court. I'm sorry.

"The [Plaintiff]: You're a house nigger.

"The Court: What was that, Mr. Johnson? You got something to say?

"The [Plaintiff]: You are Stephen from—

"[The Respondent's Attorney]: Oh my God.

"The [Plaintiff]: You are Stephen from the movie Django.[3] I am [going to] go [to] the Department of Justice [to] investigate. You are corrupt. You can kiss my ass.

"The Court: Okay. Mr. Johnson—

"The [Plaintiff]: Fuck out of here.

"The Court: —just got yourself held in criminal contempt of court.

"The [Plaintiff]: I don't care.

"The Court: Would you like counsel?

"The [Plaintiff]: I'm doing life.

* * *

"The Court: Sir, would you like counsel?

"The [Plaintiff]: Fuck out of here.

"The Correctional Officer: Johnson.

"The [Plaintiff]: Let's go. Kiss my ass.

"The Court: [The plaintiff], would you—don't—do not . . . remove him from the room.

"The Correctional Officer: Copy that, Your Honor.

"The Court: Would you like counsel appointed to represent you, Mr. Johnson? You face six months [of] incarceration . . . and [a] $100 fine. Would you like counsel?

"The [Plaintiff]: Yeah.

"The Court: I'm sorry?

---

[3] "Django" appears to refer to the 2012 film Django Unchained by writer and director Quentin Tarantino, in which the character Stephen is the head enslaved person of a Mississippi plantation and is generally understood to be a villain. Django Unchained (Columbia Pictures 2012).

"The [Plaintiff]: Have the state pay. Yeah." (Footnote added.)

The trial court then coordinated with the clerk's office to find an attorney from the public defender's office who was available to represent the plaintiff. While the court did so, the plaintiff continued to interrupt the court and to refer to the court with racially charged insults. The court notified the plaintiff that his continued disruptions had resulted in a second count of contempt.[4] While the plaintiff was engaged in this behavior, the plaintiff, the respondent's attorney, and several witnesses were logged on to the virtual courtroom. As the respondent's attorney was asking that the respondent's witnesses be released, the plaintiff again referred to the court using a racial slur and was held in contempt for a third time.[5]

---

[4] After the plaintiff agreed to allow the trial court to secure counsel for him, the following colloquy took place:

"The Court: Okay. [Addressing the clerk, the court asked] [y]ou want to do me a favor? Let's see if we can get one of the public defenders.

"The [Plaintiff]: House nigger ass.

"The Court: We'll need to . . . send them a link. That's a second count of contempt, Mr. Johnson. The court heard that as well. So, now you face up to [one] year [of] incarceration and up to $200 in fines for criminal contempt of court. Your cursing at the court is inappropriate and unnecessary.

"The Clerk: No one is available right now. [They]—have court or are meeting with clients. Chris—so, he said he would let me know, or I don't (indiscernible).

"The Correctional Officer: Johnson, [are] you leaving? Nobody?

"The [Plaintiff]: Ask the house nigger.

"The Correctional Officer: Okay. You want to leave? Do you want to leave? I'll give you—

"The Court: . . . this is . . . the court. Do not remove [the plaintiff] from the room. He just got held in contempt of court. We're getting a public defender to represent him.

"The [Plaintiff]: I don't (indiscernible) why you wear a robe as the judge because you're corrupt, bias[ed]. Got your ears pierced, like you're one of us. You're a sellout."

[5] The third contempt finding arose from the following colloquy:

"[The Respondent's Attorney]: Your Honor. May—

"The Court: Yes.

The trial court and court staff were able to locate Attorney Cynthia Barlow, whom the court appointed to represent the plaintiff. The court explained to her that the plaintiff faced three separate charges of contempt for "[telling] the court to kiss his ass, call[ing] the court a house Negro, among other direct swears toward the court." As the court was attempting to explain the circumstances to Attorney Barlow, the plaintiff continued berating the court with racial slurs and other profanities. The plaintiff called the court a "straight-up house nigger" and said "[f]uck out of here" to the court, just as Attorney Barlow was being apprised of the situation.

The trial court notified the plaintiff that he was facing a fourth count of contempt for those outbursts.[6] Undeterred, the plaintiff continued disrupting the proceeding to the point that Attorney Barlow asked the court if the plaintiff, her new client, could be muted, so that she could hear the court finish explaining the situation. Before the court was able to accommodate Attorney Barlow's request and to place the plaintiff on mute, the plaintiff continued to swear and disrupt the proceeding. The court eventually recessed and ordered everyone

"[The Respondent's Attorney]: May the witnesses [who] are on the screen be released for the day?

"The Court: They are released.

"[The Respondent's Attorney]: Thank you.

* * *

"The [Plaintiff]: Talk like you a judge. You ain't no judge. You passed the bar because you're corrupt. You're a passive house nigger, [a] disgrace to the uniform.

"The Court: And that's three, Mr. Johnson. You are on audio. I'd advise you to cut it out. The use of the N-word toward the court is, again, another count of contempt [that] you just got held in. You have counsel coming. I would advise you to be quiet—

"The [Plaintiff]: Freedom of speech."

[6] Later, prior to sentencing, the trial court, on its own, vacated one of the findings of contempt because it did not actually hear what the plaintiff had said and only knew that he had said something offensive based on the reaction of the respondent's attorney. See footnote 8 of this opinion.

involved with the virtual hearing to log out, so that Attorney Barlow and the plaintiff could have some time to speak privately before the court resumed the proceeding.

After she was able to converse privately with the plaintiff, and the hearing resumed, Attorney Barlow explained to the trial court that the plaintiff was experiencing some issues that day because he had not taken his medications and was having difficulty with transferring to and from his wheelchair.[7] Attorney Barlow further explained that the plaintiff wished to apologize to the court in his own words. Before the plaintiff spoke, the judge explained that he was reducing the four findings of contempt to three because he had not personally heard one of the racial slurs that formed the basis for one of the counts of contempt.[8]

The plaintiff then stated: "Well, Your Honor, I'm incompetent. I've been trying to get Mental Health [sic]

---

[7] Attorney Barlow argued: "[The plaintiff] was relating to me some things that have been going on in his day today, namely, not being on his medications. He also said that he's experiencing some external and internal issues. The internal issues are hallucinatory in nature, and then he had some issues with his transfers. He does certain transfers because he's in a wheelchair. He does them himself on a sliding board, and that was not going very well today. And I think he's, kind of, worked himself up into a bit of a state and, also, the lack of . . . medications is, kind of, putting him into a presentation that he's not very . . . comfortable with right now. And I think he's not in full control of his faculties right now. He did want to say, in his own words to the court, I'm sorry, and I think I would let him say that in his words. I think it's just going to be very short, but . . . he has cycled through telling me about some of the things that he's been going through today with his mental and his physical health, specifically, his transfers and his not being on medication. So, if I may, I would turn it back over to him."

[8] The trial court explained: "In reviewing the things . . . so, the court, being fair . . . and I know [the plaintiff] said something. I didn't quite catch it because I saw the reaction of the [respondent's attorney]. I'm going to reduce and vacate one of the counts of contempt because I didn't actually hear what he said. So, he's right now facing three counts for kiss my ass, house Negro, and house nigger, which were all directed at the court. The first comment, again, I know he said something offensive. It was a curse. I didn't actually hear it. So, to be fair, I am going to, let's say, let that slide."

to give me my treatment. I don't recall any of this. But I talked to my lawyer, and I'm sorry, but I'm really distraught. I really want to see Mental Health [sic], Your Honor, to get my medication. I really need to see Mental Health [sic]. . . . I'm experiencing mental issues right now." Thereafter, the trial court issued its ruling, finding the plaintiff in contempt on three separate counts and sentencing him to six months of incarceration on each count, to be served consecutively.[9] Thereafter, the plaintiff filed this writ of error.

---

[9] In issuing its ruling, the trial court explained: "Let's start with this: If this were the first day [that the plaintiff] had been untoward or disrespectful toward the court, he may have some excuse. And I understand, Attorney Barlow, you're trying to do your job as an officer of the court.

"The conduct the court witnessed today is really nothing different [from] what the court has witnessed in the other two days of [the plaintiff's] trial and in other matters the court has had him in, where he does not like a ruling or he believes the court is against him, and he begins to converse at the court as if he is either in the lunchroom or in the yard.

"And that's where we started this morning, because I indicated to [the plaintiff that] he needed to formally identify himself, and his response was, I don't need that, you know who I am, and he started with that kind of tone to the court. And, then, when I tried to remind him of that and that he needed to conduct himself because he was in a courtroom, and the court wasn't going to put up with it, that's what led [to] the tirade of [the plaintiff], [his] swearing at the court, call[ing] the court a house nigger, telling the court . . . that [it] is corrupt and et cetera.

"With regard to his claim that he is experiencing mental issues and [is] incompetent, again, [the plaintiff] is far from incompetent. He is . . . highly intelligent."

As the trial court was announcing its ruling, the plaintiff again started to disrupt the court. As a result, the court muted him. The court then continued: "So, again, [the plaintiff], for the record, has been muted because—[correctional officer], do not remove him from the room. He is, right now, being sentenced [for] contempt. Please close the door.

"So, again, this is [the plaintiff's] typical conduct. He started off this morning, there was no issue with his ability to respond to the court, and, in fact, after I held him in contempt for the first time—he needs to remain in the room—in the—this is a sentencing—he responded directly to the court.

"When I reminded him that he had already been held in contempt and that he was on the record and that he should cease making comments, he responded directly to the court and, in fact, made more comments to the court for which he was held in contempt.

"And, so, the most offensive comment, when he was reminded [that] he was being held in contempt, was 'I'm doing life. I don't care. You can't hurt me.' That is part of the problem with individuals, like [the plaintiff], who

In his writ of error, the plaintiff asserts that the trial court violated his right to due process by failing to defer the summary criminal contempt proceeding. Specifically, the plaintiff asserts that the court became "personally embroiled" in the dispute with the plaintiff, such that recusal was required. The plaintiff also asserts that the court should have deferred the proceeding because the court had already recessed the proceeding to give the plaintiff an opportunity to speak with counsel, and because the plaintiff had represented that he was experiencing struggles with his physical and mental health that day. We are not persuaded.

The following legal principles guide our analysis of the plaintiff's writ of error. "[A] writ of error . . . is the sole method of review of [summary criminal contempt] proceedings. . . . The scope of our review reaches only those matters appearing as of record. . . . In a review of summary criminal contempt, [our] inquiry [has traditionally been] limited to a determination of the jurisdiction of the [trial court]. . . . Subsumed in this inquiry are three questions, namely, (1) whether the designated conduct is legally susceptible of constituting a contempt . . . (2) whether the punishment imposed was authorized by law . . . and (3) whether the judicial authority was qualified to conduct the hearing." (Citations omitted; internal quotation marks omitted.) *Martin* v. *Flanagan*, 259 Conn. 487, 494, 789 A.2d 979 (2002). In *Hardy* v. *Superior Court*, 305 Conn. 824, 48 A.3d 50 (2012), this court took the "opportunity to clarify that [it] may undertake a broader review, one that encompasses the plaintiff's claim that his summary contempt adjudication was procedurally defective." Id.,

are doing lengthy sentences and believe that they can overtly disrespect the court and can't be touched, so to speak.

"So, that being said, the appropriate sentence to send a message to [the plaintiff] that he can be touched and that, just because he is doing a life sentence, he cannot overtly disrespect the court because he doesn't like [its] rulings."

833. In conducting that review, this court will not disturb the historical facts found by a trial court unless they are clearly erroneous, but whether the conduct constitutes contemptuous conduct is a legal question to be reviewed de novo by this court. See, e.g., *State* v. *Garrison*, 350 Conn. 61, 70, 323 A.3d 279 (2024) (in reviewing trial court's determination of whether defendant was in custody for purposes of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we will not overturn historical facts found by trial court unless they are clearly erroneous, but we review whether those historical facts indicate that defendant was in custody de novo).

"Contempt is a disobedience [of] the rules and orders of a court which has power to punish for such an offense. . . . Criminal contempt is conduct which is directed against the dignity and authority of the court. . . . Sanctions [for criminal contempt] are imposed in order to vindicate that authority. . . . The inherent power of the court to punish as a criminal contempt conduct that constitutes an affront to the court's dignity and authority is expressly recognized in our statutes; see General Statutes § 51-33a (a); and in our rules of practice. See Practice Book § 1-14."[10] (Citations omitted; footnote omitted; internal quotation marks omitted.) *Hardy* v. *Superior Court*, supra, 305 Conn. 834–35.

"[When] contemptuous conduct is committed in the presence of the court, punishment may be announced summarily. . . . Under such circumstances, no witnesses are required in proof of the contempt, and the court has inherent power to impose punishment on its own knowledge and of its own motion without formal presentation or hearing of the person adjudged in con-

---

[10] Practice Book § 1-14 provides: "Conduct that is directed against the dignity and authority of the court shall be criminal contempt, and may be adjudicated summarily or nonsummarily. The sanction for a criminal contempt is punitive to vindicate the authority of the court."

tempt . . . . Without the [summary contempt] power, a court would be helpless against persons disposed to obstruct, delay or thwart it. . . . This being the summary contempt power's justification, the sole credible basis for the summary contempt process is necessity, a need that the assigned role of the judiciary be not frustrated. . . . [T]his judicial power . . . should be exercised sparingly and in accordance with the requirements of due process. Summary criminal contempt should not be employed as a means of abuse . . . . Whenever possible, the trial court should rely on its superior ability to defuse confrontation in lieu of invoking its power to impose sanctions for contempt. . . . [When] the judge decides to impose sanctions for misconduct, ordinarily [the judge should] impose the least severe sanction appropriate to correct the abuse and to deter repetition . . . . [T]he United States Supreme Court has indicated that it is wary of the [summary contempt] power and cognizant of its potential for abuse. It, therefore, became established early in American jurisprudence that contempt limits a court in such cases to the least possible power adequate to the end proposed." (Citations omitted; internal quotation marks omitted.) Id., 835–36.

"Practice Book § 1-16 sets forth a procedure that a trial court must follow before summarily holding someone in contempt: 'Prior to any finding of guilt, the judicial authority shall inform the defendant of the charges against him or her and inquire as to whether the defendant has any cause to show why he or she should not be adjudged guilty of summary criminal contempt by presenting evidence of acquitting or mitigating circumstances.' Although fast and informal, the procedure set forth in . . . § 1-16 clearly includes notice and an opportunity to be heard, two due process elements that the United States Supreme Court has described as 'basic in our system of jurisprudence.' . . . Moreover . . .

§ 1-16 requires in clear terms that the aforementioned notice and hearing be afforded to an alleged contemnor before he is found guilty." (Citation omitted; emphasis omitted.) Id., 837–38.

"Above all, a summary contempt adjudication need not rigidly adhere to the timing requirements of the rules of practice. For example, contrary to the literal text of the relevant rule of practice, the trial court may find a person in contempt before affording him notice of the charge if it advises him of the basis of the contempt finding and then invites him to allocute." (Emphasis omitted.) Id., 842. See generally *Jackson* v. *Bailey*, 221 Conn. 498, 514, 605 A.2d 1350 ("For that statement, I'm finding you in contempt . . . . Do you have any reason why I should not find you in contempt?" (Internal quotation marks omitted.)), cert. denied, 506 U.S. 875, 113 S. Ct. 216, 121 L. Ed. 2d 155 (1992). "In such circumstances, the contempt finding itself apparently serves as notice of the charge. It is also clear that the trial court generally may find a person in contempt before it invites him to allocute, even though the literal text of the rules of practice requires the reverse." *Hardy* v. *Superior Court*, supra, 305 Conn. 842–43.

"Furthermore, in certain circumstances, the trial court may dispense with notice or allocution altogether. If a contemnor has good reason to know that his conduct is contemptuous, the trial court need not afford him any express notice of the charge. . . . Even more so, if a contemnor *repeats* misconduct for which he already has been duly sanctioned, the trial court may find him in contempt for his repeat misconduct without affording him either notice or allocution. . . . The reason why a trial court may dispense altogether with notice and allocution in a case of repeat misconduct is that the contemnor in such a case already is aware of the nature of his misconduct and already has had the opportunity

to give an explanation for *identical* misconduct." (Citations omitted; emphasis in original.) Id., 843.

In the present case, the record demonstrates that the trial court warned the plaintiff about his behavior prior to finding him in contempt. Indeed, our review of the record indicates that the court warned the plaintiff multiple times before even mentioning contempt. The judge did not mention contempt until after the plaintiff referred to him using a racial slur and used profanity several times.

Immediately after holding the plaintiff in contempt, the trial court asked the plaintiff whether he wanted the court to appoint counsel to represent him. The plaintiff continued to swear and refer to the court using racial slurs. The court continued to warn the plaintiff about his cursing and explained that it was resulting in a second finding of contempt. Meanwhile, the court and court staff attempted to locate an attorney to represent the plaintiff, and the plaintiff continued to direct racial slurs at the court and to swear in the presence of witnesses, court staff, and the respondent's attorney. Prior to sentencing the plaintiff for contempt, the court had appointed counsel to represent him, provided an opportunity for counsel to speak privately with the plaintiff, heard from his counsel, and heard from the plaintiff himself.

Given these facts, we agree with the defendant in error that "the proceeding in which the trial court convicted and sentenced the plaintiff for summary criminal contempt substantially complied with the requirements of Practice Book § 1-16." Id., 843–44. Like in *Hardy*, "the record establishes that the plaintiff was on notice of the nature of his misconduct" and had been allowed "an opportunity to give an explanation for that misconduct . . . ." Id., 844. Accordingly, we conclude that "the proceeding served the overarching purpose of . . .

§ 1-16, namely, to ensure fairness in the adjudication of summary criminal contempt." Id.

The plaintiff asserts that the trial court violated his right to due process by failing to recuse itself and to defer the contempt proceeding pursuant to Practice Book § 1-17. Section 1-17 provides: "The judicial authority should defer criminal contempt proceedings when: (1) the misconduct does not rise to an obstruction to the orderly administration of justice; (2) the judicial authority has become personally embroiled; (3) the misconduct did not occur in the presence of the court; and (4) the judicial authority does not instantly impose summary criminal contempt upon the commission of the contumacious act."

The plaintiff argues that the trial court should have deferred the contempt proceeding because the plaintiff's behavior did not obstruct the orderly administration of justice. See Practice Book § 1-17 (1). We disagree. The record reveals that, from the start of the proceeding, the plaintiff refused to comply with the court's instructions and that his refusal to do so, along with his repeated use of racial slurs and profanity, interfered with the court's ability to conduct the hearing. The record also demonstrates that the respondent's attorney was ready to proceed and that the respondent's witnesses were present, but the proceeding was adjourned and the witnesses were excused after the plaintiff refused to comply with the court's instructions and continued interrupting the court. All of the respondent's witnesses who were present in the virtual courtroom that day observed the plaintiff's behavior, as did the respondent's attorney, who exclaimed on the record, "[o]h my God," in the midst of the plaintiff's racially charged tirade directed at the court.

The plaintiff's behavior interfered with the ability of the trial court to communicate with staff from the Department of Correction, with court staff and, ulti-

mately, with Attorney Barlow, who was appointed to represent the plaintiff. The plaintiff repeatedly interrupted the court and even his own attorney. His conduct was sufficiently disruptive that his own counsel found it necessary, at one point, to ask if he could be muted, so that she could hear what the court was saying.

The plaintiff counters, however, that his behavior did not interfere with the orderly administration of justice because much of his behavior occurred after the trial court had announced that the hearing was over. We disagree. Although the court did attempt to defuse the situation and to end the proceeding for the day after the plaintiff's initial outburst, the plaintiff's inappropriate behavior continued to interfere with the proceeding before, during and after the court terminated the hearing for the day. Indeed, as the court was indicating that the matter was canceled for the day and that it would be rescheduled for another day, the plaintiff interrupted the court, and he used repeated racial slurs and profanities before the court was able to end the proceeding.

Although this proceeding was being conducted virtually, it still occurred in a courtroom, and the trial court had an obligation to maintain decorum and to protect its ability to conduct the proceeding without the disruption caused by the plaintiff's abusive conduct.[11] As we explained,

---

[11] Indeed, we note that the Connecticut Judicial Branch has created the Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties "to assist anyone who is preparing to participate in a remote court event. This includes counsel, self-represented parties, and other necessary participants, such as witnesses." Connecticut Judicial Branch, Connecticut Guide to Remote Hearings for Attorneys and Self-Represented Parties (January 17, 2024) p. 4, available at https://jud.ct.gov/HomePDFs/ConnecticutGuide RemoteHearings.pdf (last visited June 12, 2025) (Connecticut Guide to Remote Hearings). The Connecticut Guide to Remote Hearings clarifies that, "[g]enerally, a virtual courtroom requires [that the parties, counsel, and other participants follow] the same formal etiquette and protocol of a physical courtroom, with certain additions. This includes, but is not limited to [the following] . . . . Do not speak unless you are asked to speak. Do not interrupt other participants when they are speaking or attempt to speak over them." Id., p. 19.

the court, the respondent's attorney and the respondent's witnesses were all present in the virtual courtroom and were ready to proceed with the plaintiff's habeas trial. The plaintiff's behavior interfered with their ability to do so. Moreover, when the court announced that the matter would be postponed, the plaintiff interrupted the court, and the court was unable to even continue the matter to a later date because of the plaintiff's repeated interruptions.[12] On the basis of the record, we conclude that the plaintiff's behavior obstructed the orderly administration of justice.

The plaintiff further asserts that the trial court should have deferred the proceeding because it did not "instantly impose summary criminal contempt upon the commission of the contumacious act." Practice Book § 1-17 (4). We disagree. The record reflects that the court immediately informed the plaintiff that his conduct was resulting in contempt charges and explained the implication of those charges. Any delay in the imposition of

---

[12] To the extent that the plaintiff asserts that the trial court provoked his behavior, we disagree. Our review of the transcript and audio recording of the proceeding demonstrates that the court was attempting to end the proceeding for the day but that the plaintiff continued to interrupt and talk over the court and to use racial slurs. Despite the plaintiff's unruly behavior, the court maintained a calm demeanor. Only after the plaintiff repeatedly spoke over the court and prevented it from ending the proceeding did the court ask the plaintiff if he had something to say. It is clear that the court's statement was aimed at clarification, not provocation.

Furthermore, the plaintiff had already engaged in contemptuous behavior when the trial court asked him for an explanation. In fact, before the court had made any finding of contempt, the plaintiff had already called the court a "house nigger" three times. Therefore, we cannot conclude that the trial court provoked the plaintiff. Similarly, the court was under no obligation to mute the plaintiff when he began his contemptuous behavior, and such a reaction by the court would have interfered with the ability of the court and the plaintiff to communicate with each other. It is important to note that the findings of contempt all arose from the plaintiff's behavior while the court and the parties were on the record, either because the court was addressing a particular issue or informing the parties about the status of the request for a public defender.

the summary criminal contempt was minimal and was the result of the plaintiff's repeated and increasing interruptions of the court. Because the self-represented plaintiff's repeated behavior resulted in three findings of contempt,[13] the court paused the proceeding to obtain counsel for the plaintiff, and, per the request of that counsel, it ordered a brief recess so that counsel could to speak with the plaintiff. Such delay was proper and does not support the plaintiff's claim that the trial court did not instantly impose summary criminal contempt.

The brief delay demonstrates only that the trial court was ensuring that the plaintiff had notice of the charges against him and an opportunity to explain his misconduct with the assistance of counsel. As we concluded previously in this opinion, the proceeding served the overarching purpose of Practice Book § 1-16, namely, to ensure fairness in the adjudication of summary criminal contempt. We cannot conclude that the fact that the trial court paused the proceeding to allow the plaintiff to be assisted by counsel somehow diminished the fairness of the proceeding.

We also reject the plaintiff's claim that the trial court should have deferred the contempt proceeding because the court had become personally embroiled. See Practice Book § 1-17 (2). "[In] *Mayberry* v. *Pennsylvania*, [400 U.S. 455, 465–66, 91 S. Ct. 499, 27 L. Ed. 2d 532 (1971)], [the United States Supreme Court] held . . . that the fair administration of justice disqualifies a judge from sitting in judgment on a contempt charge if he [or she] has become so personally embroiled with a contemnor that it is unlikely for [the judge] to maintain that calm detachment necessary for fair adjudication.

---

[13] There were multiple instances of the plaintiff engaging in contemptuous conduct during the proceeding. The plaintiff referred to the court by the racial slur "house nigger" a total of seven times, he called the court a "house Negro" once, he told the court to get the "[f]uck out of here" three times and to "kiss [his] ass" twice, and he described the court as "corrupt" four times.

. . . In general, in order to determine whether a judge was required to recuse him or herself due to personal embroilment, we must appraise both the conduct of the contemnor and the reaction of the judge. [Although] personal embroilment is a more likely reaction when the contemnor has mounted a personal attack on the judge, it may also be found in the character of the judge's response, if the judge has become visibly involved in a running controversy with the contemnor. [T]he inquiry must be . . . whether there was such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused. . . . Consequently, judicial recusal is necessary only in the unusual case [in which] the apparent effect of the contemnor's conduct on the judge against whom the contemptuous conduct was levied is such as to indicate that the judge's impartiality or objectivity reasonably may be called into question." (Citations omitted; internal quotation marks omitted.) *Banks* v. *Thomas*, 241 Conn. 569, 599–600, 698 A.2d 268 (1997).

We have explained "that significant evidence of personal embroilment would constitute an appropriate situation for deferred adjudication or deferred sentencing before a different judge." *Naunchek* v. *Naunchek*, 191 Conn. 110, 117, 463 A.2d 603 (1983); see, e.g., *Sandstrom* v. *Butterworth*, 738 F.2d 1200, 1213–14 (11th Cir. 1984) (Concluding that the trial judge was personally embroiled, such that imposition of contempt should have been deferred, when the evidence showed that, "[a]t different points during the trial, the judge referred to the petitioner as 'rude and nasty,' and as 'acting like an animal;' the judge repeatedly said he was 'sick of' the petitioner. He referred to [the] petitioner's law partner as a 'little creep,' and said that he was 'sick of' him. Shortly before finding [the] petitioner guilty of contempt and sentencing him, the trial judge said that for ten years the peti-

tioner had had a 'nauseating effect' [on] him and every other [judge] in the courthouse."), cert. denied, 469 U.S. 1109, 105 S. Ct. 787, 83 L. Ed. 2d 781 (1985); see also, e.g., 1 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 6, standard 6-4.5 ("[t]he judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge if the original judge's conduct was so integrated with the contempt so as to have contributed to it or was otherwise involved, or if the original judge's objectivity can reasonably be questioned").

Our review of the record persuades us that the plaintiff has failed to present significant evidence that the trial court was so personally embroiled in a running controversy with the plaintiff that disqualification was required.[14] A review of the transcript and the audio recording of the hearing reveals that, although the plaintiff repeatedly directed racial slurs and other profanity at the trial court, the court responded to the plaintiff with a calm demeanor, gave repeated warnings to the plaintiff, which he ignored, and offered the plaintiff the opportunity to speak to his counsel privately.

Furthermore, the trial court's initial response to the plaintiff's wilful resistance to identify himself for the record was appropriate. When the plaintiff continued to engage in disrespectful behavior, the court repeatedly instructed the plaintiff to stop talking. Despite the plaintiff's repeated refusal to heed the court's warnings and instructions, the court afforded him an opportunity to speak to counsel and to make a statement before sentencing him. Nonetheless, the plaintiff persisted in defying the court's orders and insisted on referring to the court using racial slurs and other profanity. The record demonstrates that, despite the plaintiff's extreme behav-

---

[14] See footnote 2 of this opinion.

ior, the court's response was calm and professional throughout the proceeding.

The plaintiff suggests that the fact that he used racial slurs and other profanities directed at the trial court demonstrates that the court was personally embroiled in the conduct. Not so. Evidence of personal attacks against the court is not, standing alone, sufficient to demonstrate embroilment. Instead, this court has explained that, "[although] personal embroilment is a more likely reaction when the contemnor has mounted a personal attack on the judge, it may also be found in the character of the judge's response . . . ." (Internal quotation marks omitted.) *Banks* v. *Thomas*, supra, 241 Conn. 600. We cannot agree that a plaintiff can demonstrate embroilment merely by providing evidence that he or she had made personal attacks against a trial judge. Indeed, adopting such a position would enable the plaintiff to benefit from his own wilful and extreme misbehavior, which we do not countenance.

As the United States Supreme Court has explained, "we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case." *Mayberry* v. *Pennsylvania*, supra, 400 U.S. 463.[15] In the present case, our review reveals that, despite the plaintiff's repeated personal attacks on the trial court, the court did not become so personally embroiled in an ongoing controversy with the plaintiff that recusal was necessary to safeguard the plaintiff's due process rights.

Finally, the plaintiff claims that the trial court should have deferred the proceeding because both the plaintiff

---

[15] In *Mayberry*, the United States Supreme Court concluded that it was improper for the trial judge to act on the contempt charge *at the end of* the trial but that he could, "with propriety," have disposed of it himself *during* trial. *Mayberry* v. *Pennsylvania*, supra, 400 U.S. 463–64. In the present case, the court properly acted on the contempt charges during the proceeding. See, e.g., *State* v. *Friel*, 497 A.2d 475, 478 n.3 (Me.), cert. denied sub nom. *Campbell* v. *Maine*, 474 U.S. 1032, 106 S. Ct. 594, 88 L. Ed. 2d 574 (1985).

and his counsel had communicated to the court that the plaintiff had medical issues and that he was not competent to proceed with the contempt proceeding. We disagree.

It is important to note that, when the issue regarding the plaintiff's mental state was brought to the attention of the trial court, the plaintiff was represented by counsel, and the court provided the plaintiff with an opportunity to confer with his counsel. Although we appreciate that counsel had just been appointed and had stepped into a difficult situation, we note that, despite the plaintiff's assertion that he was "incompetent," his counsel did not request that the trial court undertake a competency review. As this court has frequently observed, "[t]he trial judge is in a particularly advantageous position to observe a [party's] conduct during a trial and has a unique opportunity to assess a [party's] competency. A trial court's opinion, therefore, of the competency of a [party] is highly significant." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 523–24, 973 A.2d 627 (2009). In the present case, the trial court rejected the plaintiff's claim regarding his competency on the basis of its own observations of the plaintiff's behavior during this proceeding. The court explained: "With regard to [the plaintiff's] claim that he is experiencing mental issues and [is] incompetent, again, [the plaintiff] is far from incompetent. He is . . . highly intelligent." And, on the basis of its own observations on that day, the court noted that the plaintiff was able to respond to the court and had even demonstrated his understanding that a contempt finding would not impact him because he was already serving a life sentence. Given the lack of a request for a competency evaluation by the plaintiff's counsel, and the trial court's own observations of the plaintiff's competency, we cannot conclude that the court improperly declined to defer

the contempt proceeding because of concerns about the plaintiff's competency.

The writ of error is dismissed.

In this opinion the other justices concurred.